Nancy **PERKINS** and Kenneth Perkins, Movants,

v.

Siegfried **HAUSLADEN**, M.D., Respondent.

No. 91–SC–003–DG.

Supreme Court of Kentucky.

April 9, 1992.

Mary G. Hayes, Ft. Wright, for movants.

Frank V. Benton, III, Ft. Thomas, for respondent.

LEIBSON, Justice.

Nancy Lee Perkins sued Dr. Siegfried Hausladen for negligence in performing surgery to remove diseased tissue from her inner ear. Specifically, the diseased condition was called a "cholestatoma." To reach the site of the cholestatoma, it was necessary to drill through the "cortex of the mastoid bone." The doctor admitted on deposition that in doing so one of the prime objectives of the surgeon is to make sure he does not tear the sigmoid sinus, a vein that drains the brain area into the internal jugular vein. Yet that is what occurred in this case.

When the bleeding could not be controlled sufficiently, packing was used and the operation discontinued. The packing stopped the flow of blood and caused a "venous thrombosis" (blood clot), which in turn caused increased intracranial pressure, so that ultimately Nancy Perkins lost the sight of her right eye from damage to the optic nerve from this pressure. Unfortunately, she was already blind in her other eye, so that the sequence of events that started with the aborted attempt to operate on her left ear culminated in total blindness. The medical evidence from the physicians who treated Nancy Perkins after the surgery, provided by deposition, established the causation for the damage to the optic nerve and irreversible blindness. Further, Dr. Hausladen admitted on deposition that if there had not been a tear of the sigmoid sinus, Nancy Perkins probably would not have had the increased intracranial pressure with the accompanying loss of vision.

According to the deposition of Kenneth Perkins, Nancy Perkins' husband, after the surgery Dr. Hausladen told Kenneth he had "drilled in and he had hit a blood vein and had to stop surgery." Further, the "Operative Record" prepared by Dr. Hausladen after the surgery specified, "[w]hen I did the last bit of drilling, there was a very small leak in the sigmoid sinus and some Gelfoam was placed over this." The record continues:

"An attempt was then made to decompress the sigmoid sinus and pull it down and out of the way and at this time a little tear occurred as I was putting a pack in there to decompress it."

Thus, although Dr. Hausladen later denied on deposition drilling into the sigmoid sinus or causing a further tear in subsequent manipulation, the husband's testimony and the Operative Record both suggest otherwise.

On the morning of trial, defense counsel moved for summary judgment on grounds the plaintiffs had announced ready but had no expert witness to testify the doctor was negligent, and the trial court granted the motion.

In the Court of Appeals the Perkinses argued both substantive and procedural error, contending:

1) That *res ipsa loquitur* applies here because the jury can infer negligence from the facts alone, when Dr. Hausladen's deposition testimony and admissions are included; and

2) That granting summary judgment when the motion was filed on the day of trial violated the mandatory requirement in CR 56.03 that a summary judgment "motion shall be served at least ten (10) days before the time fixed for the hearing."

The Court of Appeals rejected both arguments, and affirmed the trial court's summary judgment. We have accepted discretionary review, and reverse on both issues.

First we turn to the substantive issue. The Court of Appeals did not believe there was any significant conflict in the evidence regarding the cause of the tearing of the sigmoid sinus and the bleeding that occurred. We conclude there was. The Court of Appeals summarized the evidence by referring only to the doctor's deposition testimony, which was "that he did not drill into or tear the sigmoid sinus, rather, it

began to leak as he was attempting to move it away from the operative site." But the husband testified the doctor told him he "drilled in" and "hit a blood vein." The Operative Record supported that inference, plus a further inference that the resulting tear in the blood vessel expanded upon his further manipulation.

At the hearing on the motion for summary judgment, the trial court proceeded on the premise that the defendant "admitted tearing and/or cutting or invading that vein in some fashion." The defense counsel stipulated that "for the purposes of this argument let us assume that in the course of this operation and that in the course of manipulating the sigmoid sinus, he [the doctor] tore it or cut it or whatever you want to say." The Court of Appeals proceeds erroneously from the opposite premise.

■ In *Steelvest, Inc. v. Scansteel Service Ctr.*, Ky., 807 S.W.2d 476 (1991) we reaffirmed our strict standard for granting summary judgment, rejecting the turn to a more liberal approach found in recent federal cases. *Steelvest* cites *Paintsville Hosp. Co. v. Rose*, Ky., 683 S.W.2d 255, 256 (1985), which stated:

"The proper function for a summary judgment in a case of this nature 'is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.' [Case cited].... Summary judgment ... is not a substitute for trial, nor is it the functional equivalent of a motion for directed verdict."

We accept that "impossible" is used in a practical sense, not in an absolute sense. Nevertheless, on motion for summary judgment we must accept plaintiffs' version as to how the injury occurred and caused her blindness, as gleaned from the pretrial record, and all reasonable inferences therefrom. The issue under review is whether, using this standard, summary judgment was appropriate simply because the plaintiff did not have an expert witness available to testify that this surgical procedure fell below the standard of reasonable care. As stated in the trial court's summary judgment, prepared by defense counsel, here summary judgment was granted because the court concluded that "under the facts of this case, ... medical expert testimony is necessary in order to present a jury question."

There are additional facts to be considered in reviewing this conclusion. The doctor testified that he had performed this operation previously "a hundred and forty (or) hundred and fifty times" and had never drilled into the sigmoid sinus; that he had been taught to identify the sigmoid sinus and avoid drilling into the sinus because if you do so "it will bleed"; that one of the prime objectives of the surgeon during this surgery is to make sure he does not tear the sigmoid sinus; and that he did in fact identify the sigmoid sinus before it was damaged. The Perkinses contend here that "the doctor testified as to the standard of care required in such an operation"; that "given the doctor's previous admissions [to the husband and in the Operative Record] and testimony as to the standard of care, coupled with the testimony from subsequent treating physicians that the bleeding was the cause of Nancy Perkins' subsequent blindness, a lay person would recognize the negligence." Thus the Perkinses contend that Dr. Hausladen's deposition provided all the evidence they needed to take the case to the jury on the issue of the doctor's negligence.

The trial court and the Court of Appeals have framed the issue in terms of whether the doctrine of *res ipsa loquitur* applies here. As applied to this case the term means nothing more than whether the facts and circumstances are such that negligence can be inferred, even in the absence of expert testimony. As Prosser explains, *res ipsa loquitur* is a "Latin phrase, which means nothing more than the thing speaks for itself," and is simply "[o]ne type of circumstantial evidence." *Prosser and Keeton on Torts*, Sec. 39 (5th ed. 1984). Speaking to how the doctrine applies to the "question of duty ... in cases of medical malpractice," *Prosser* advises that "ordi-

narily" negligence cannot be inferred simply from an "undesirable result"; expert testimony is needed. *Id.* at 256. But there are two important exceptions, one involving a situation where "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care"; illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy. *Id.* The second occurs when "medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters." *Id.* at 257. Both exceptions are involved here.

Kentucky cases follow the same approach as *Prosser* enunciates. *Butts v. Watts,* Ky., 290 S.W.2d 777, 778 (1956) held that "evidence of a technical character" sufficient to sustain the plaintiff's case could be found in "an admission of the defendant, Dr. Watts," even though the plaintiff had no expert witness. It quotes with approval from *Goodwin v. Hertzberg,* 91 U.S.App.D.C. 385, 201 F.2d 204, 205 (D.C.Cir.1952), a case with a factual scenario analogous to the present one, in which a "surgeon in performing an operation wherein it was necessary to use care not to perforate the patient's urethra" succeeded in doing so. We stated:

"It is immaterial that no expert testify that appellee acted negligently."

Other Kentucky cases somewhat similar in character are *Jewish Hospital Association of Louisville, Ky. v. Lewis,* Ky., 442 S.W.2d 299 (1969), holding *res ipsa loquitur* applied where there was extensive bleeding following a catheterization procedure; *Neal v. Wilmoth,* Ky., 342 S.W.2d 701 (1961), holding *res ipsa loquitur* applied where the dentist's drill slipped off the tooth; *Meiman v. Rehabilitation Center,* Ky., 444 S.W.2d 78 (1969), holding *res ipsa loquitur* applied where a bone was broken during therapy treatment; and *Laws v. Harter,* Ky., 534 S.W.2d 449 (1976), holding that *res ipsa loquitur* applied where a sponge was left in the patient during a surgical procedure. In all of these cases an inference of negligence was sufficiently supplied by medical testimony of record even though the plaintiff had no expert witness to opine that the conduct fell below the standard of acceptable professional care. In *Jarboe v. Harting,* Ky., 397 S.W.2d 775, 778 (1965), addressing the "general rule" that "expert testimony is required in a malpractice case to show that the defendant failed to conform to the required standard," we state:

"However, it is a generally accepted proposition that the necessary expert testimony may consist of admissions by the defendant doctor. [Citations omitted]. And there is an exception to the rule in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts."

This is a case where "the necessary expert testimony" may be found in the "admissions by the defendant doctor." *Jarboe, supra.*

The case with the most similar fact situation which we have been able to find in our research is *Cho v. Kempler,* 177 Cal. App.2d 342, 2 Cal.Rptr. 167, 76 ALR2d 774 (1960). The appellate court held the case was properly allowed to go to the jury on the doctrine of *res ipsa loquitur* in a fact situation in which a doctor transected a patient's facial nerve while performing a mastoidectomy. Like the present case, the medical evidence of record established that this type of injury was not an ordinary risk of the surgery, that the method by which it occurred was within the exclusive control of the defendant, and that the injury was not due to any voluntary action or contribution on the part of the plaintiff. The court also pointed out that in determining whether the evidence was sufficient to support an inference of negligence, both common knowledge and the testimony of medical witnesses could be relied on, separately and in combination.

The *Restatement (Second) of Torts* covers *res ipsa loquitur* in Section 328D. Several of the observations in the *Restatement* are pertinent here. On dispelling its mystery, the *Restatement* states:

"A *res ipsa loquitur* case is ordinarily merely one kind of case of circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it." Comment b, p. 157.

"In the usual case the basis of past experience from which this conclusion may be drawn ... is a matter of general knowledge.... It may, however, be supplied by the evidence of the parties; and expert testimony that such an event usually does not occur without negligence may afford a sufficient base for the inference. Comment d, p. 158–59.

"[T]he plaintiff is not required to exclude all other possible conclusions beyond a reasonable doubt, and it is enough that he makes out a case from which the jury may reasonably conclude that the negligence was, more probably than not, that of the defendant." Comment f, p. 160.

"It frequently is said by courts that one basis for the application of the principle of *res ipsa loquitur* is the defendant's superior knowledge, or his superior opportunity to obtain it, as to how the event occurred.... Undoubtedly the fact that in *res ipsa loquitur* cases defendants in general have such superior knowledge, or access to it, has been a very persuasive factor in the development of the principle." Comment k, p. 164.

Thus we conclude that the facts and circumstances here, given the medical evidence developed during the taking of Dr. Hausladen's deposition, and the further medical evidence regarding causation found in the depositions of subsequent treating physicians, was sufficient to present a case of *res ipsa loquitur*, or circumstantial evidence, from which the jury could infer negligence in this case. This is not to say that it would not have been more appropriate had plaintiffs' counsel employed the services of an expert to testify further on the subject. But while we may be critical of plaintiffs' counsel's lack of preparation in a case involving an injury of this magnitude, as a bare legal proposition further evidence was not necessary to establish a submissible case.

■ The second issue addressed in the Court of Appeals' Opinion was the trial court's decision to entertain a motion for summary judgment made on the morning of trial, in violation of the requirement of CR 56.03 that "the motion shall be served at least ten days before the time fixed for the hearing." Counsel for the Perkinses argues "the rule is mandatory and not discretionary; the prejudice is without question." The Court of Appeals held that "summary judgment may be granted if the non-moving party cannot demonstrate any prejudice.... Granting a continuance [as the Perkinses counsel requested] for response time would only have postponed the inevitable result."

The only Kentucky case squarely addressing this issue is *Rexing v. Doug Evans Auto Sales, Inc.*, Ky.App., 703 S.W.2d 491 (1986). In *Rexing* the court viewed it as error to force a hearing on summary judgment short of the ten days notice requirement, stating:

"We see no reason to permit appellee to circumvent the notice requirements of our Civil Rules by ambushing appellants with last minute motions and early morning hearings. The trial court erred in refusing to grant appellants a continuance. *Id.* at 494.

The treatise on *Kentucky Practice* by Bertelsman and Philipps, 4th ed. Civil Rule 56.03, Comment 3, states:

"As the annotations following the subrule demonstrate, the 10–day lead time provided before hearing the motion is extremely important and, although not jurisdictional, may not be lightly disregarded.... [R]equests for extension of time to respond to such motions are usually freely granted, and it may be an abuse of discretion for the trial court to refuse to grant reasonable extensions."

We need not decide whether there is an inflexible rule that violation of the ten day notice requirement requires automatic reversal. There may be unusual situations where no possible prejudice could have re-

sulted from a premature hearing. But this case is not one of them. As pointed out in their Brief, the Perkinses were put at a "disadvantage by not being able to put on any affidavits, additional legal research, nor other evidence to contradict the motion."

■ In a complex negligence case, such as this, the nuances of the pretrial depositions and discovery cannot be properly addressed or fairly assessed at a summary judgment motion made on the day of trial. As stated in *Steelvest, Inc. v. Scansteel Service Ctr., supra:*

> "In Kentucky, we have clearly held that the consideration to be given to the two motions [summary judgment vs. directed verdict] is not the same and that a ruling on a summary judgment is a more delicate matter and that its inquiry requires a greater judicial determination and discretion since it takes the case away from the trier of fact before the evidence is actually heard." *Id.* at 482.

In the present case it was error to hear the motion for summary judgment on the morning of trial. Even though the plaintiffs' counsel had not employed an expert witness to testify that defendant's conduct fell below the standard of care, it was premature to decide there would be no genuine issue of fact in this respect. The trial court erred in refusing to await the development of the evidence. The proper point to have addressed this issue would have been on motion for a directed verdict.

For the reasons stated the decision of the Court of Appeals is reversed, the judgment of the trial court is vacated, and the within case is remanded to the trial court for further proceedings consistent with this Opinion.

STEPHENS, C.J., and COMBS, LAMBERT, LEIBSON, REYNOLDS and WINTERSHEIMER, JJ., concur.

SPAIN, J., dissents.