RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DONALD R. PHILLIPS,

               *Plaintiff-Appellant*,

*v.*

SHASTINE TANGILAG, M.D.; LESTER LEWIS, M.D.;
CORRECT CARE SOLUTIONS, LLC; TED H. JEFFERSON,
D.O., ANGELA CLIFFORD, M.D.,

               *Defendants-Appellees*.

> No. 20-6226

───────────────

Appeal from the United States District Court for the Western District of Kentucky at Paducah.
No. 5:16-cv-00088—Thomas B. Russell, District Judge.

Argued: April 27, 2021

Decided and Filed: September 17, 2021

Before: SILER, THAPAR, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellant. James R. Coltharp, Jr., WHITLOW, ROBERTS, HOUSTON & STRAUB, PLLC, Paducah, Kentucky, for Appellee Jefferson. William E. Sharp, BLACKBURN DOMENE & BURCHETT, PLLC, Louisville, Kentucky, for Appellees Tangilag, Lewis, Clifford, and Correct Care Solutions. **ON BRIEF:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellant. James R. Coltharp, Jr., WHITLOW, ROBERTS, HOUSTON & STRAUB, PLLC, Paducah, Kentucky, for Appellee Jefferson. William E. Sharp, Charles M. Rutledge, BLACKBURN DOMENE & BURCHETT, PLLC, Louisville, Kentucky, Katherine L. Kennedy, LEWIS BRISBOIS BISGAARD & SMITH LLP, Cincinnati, Ohio, for Appellees Tangilag, Lewis, Clifford, and Correct Care Solutions.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge. Donald Phillips, a Kentucky inmate, sought medical care for a painful, softball-size mass on his calf. A CT scan showed that his "plantaris" muscle had ruptured and caused a hematoma (internal bleeding that had pooled in the calf). The plantaris sits deep in the leg, and a person does not need it to function normally. So surgery is not the standard of care for a rupture, and a hematoma typically goes away on its own. Yet Phillips alleges that the painful mass did not go away and that his doctors violated the Eighth Amendment's ban on "cruel and unusual punishments" by refusing to surgically remove it. In most states, a non-incarcerated individual generally could not succeed on this type of challenge to a doctor's professional judgment without expert medical evidence showing that the doctor behaved incompetently. And the Supreme Court has warned that the Constitution should not give prisoners an easier path to recovery than ordinary individuals have for their ordinary tort claims. Because Phillips lacks expert evidence suggesting that his doctors were grossly incompetent, we agree with the district court's rejection of his Eighth Amendment claim. Because his other claims also lack merit, we affirm.

I

Convicted of murdering two people, Phillips has been incarcerated in Kentucky prisons since 1999. In May 2014, Phillips and his cellmate got into a fight. After harassing Phillips for weeks, his cellmate stole the extension cord that Phillips used to watch television. According to Phillips, this final "straw" led to an argument followed by "blows." Phillips Dep., R.56-4, PageID 401. The cellmate gouged out Phillips's right eye, forcing Phillips to shove it back in with his palm. When Phillips countered with a hard strike from a can lid, his cellmate retreated. Phillips did not immediately realize that his left leg had been injured because his eye pain overpowered everything else. But he later told a nurse about pain and bruising around his ankle. Phillips thought he had merely sprained his ankle, and the pain and discoloration went away in a few weeks.

By November, however, Phillips had noticed a growing lump on his left calf.  When the lump reached the size of a golf ball, he sent a sick-call request to medical staff.  Kentucky officials have contracted with Correct Care Solutions, LLC, to provide medical care to inmates.  After visiting two nurses, Phillips saw Dr. Shastine Tangilag of Correct Care Solutions.  Dr. Tangilag measured the "mass" on Phillips's calf at "5 inches in diameter."  Notes, R.1-5, PageID 57.  This measurement comports with Phillips's belief that the mass had grown to the size of a softball.

Dr. Tangilag ordered an ultrasound.  The doctor who reviewed it noted that Phillips had a "soft tissue mass" on his calf "with good blood flow" but "no definite clearcut margins[.]"  Rep., R.1-5, PageID 58.  Tangilag reported that these results were inconclusive and that she would schedule him for a CT scan primarily to rule out cancer.

Phillips underwent the CT scan at a local hospital.  The doctor who read the scan found a "fluid collection" in the location of the "plantaris muscle" that "likely represent[ed] a plantaris rupture."  Rep., R.1-5, PageID 62.  The plantaris is a muscle behind the calf.  The doctor added that he saw no evidence of a bone fracture or lesion and that the "visualized tendons and ligaments appear[ed] intact."  *Id.*

Dr. Tangilag conveyed these findings to Phillips.  In a letter, she opined that the rupture "must have been related to an old injury/trauma" and assured Phillips that it was "not cancer or any bone lesion that you should worry about."  Letter, R.1-5, PageID 64.  She later told him that she would send his CT-scan results to an outside orthopedic surgeon, Dr. Ted Jefferson, "to see if this is something surgical that needs to be fixed."  Notes, R.1-5, PageID 66.

Phillips saw Dr. Jefferson at his office in July 2015.  Agreeing with the other doctors, Jefferson told Phillips that his plantaris had ruptured.  Yet surgeons do not typically fix this rupture by surgically repairing the tendon because people do not need their plantaris to function normally.  Jefferson also explained to Phillips that blood from the rupture had internally pooled between his calf and plantaris and had caused the mass on his leg.  Jefferson tried to drain the fluid from this "hematoma" but had little success because the blood had thickened.  He suggested

that the gelatinous blood might require surgery to remove but recommended an MRI to confirm the hematoma diagnosis.

The doctor who reviewed the MRI reported that the fluid near Phillips's plantaris had decreased slightly since the CT scan and that "[n]o mass [was] identified." Rep., R.1-5, PageID 87. As a result, Dr. Jefferson advised Dr. Tangilag that Phillips did not need surgery because the hematoma was resolving.

Dr. Tangilag met with Phillips a final time in August 2015. She told Phillips that, after speaking with Dr. Jefferson, they had decided against the surgical route because the hematoma was going away. Unhappy with this decision, Phillips noted that he still experienced pain when walking. Tangilag told him to apply moist heat to his calf twice a day.

According to Phillips, the lump did not go away, and he continued to suffer pain. His leg would go numb and then throb like an impacted tooth when he stood for substantial periods. (A dispute of fact exists over whether a visible mass remains. The most recent medical examination by Phillips's outside doctors identified "[n]o clear deformity or mass" on the leg. Rep., R.139-2, PageID 1109.)

Months after his last visit with Dr. Tangilag, Phillips sent Dr. Jefferson a letter questioning whether Tangilag had accurately described Jefferson's recommended treatment. The letter indicated that Phillips's pain had increased and that the lump had not gone away. Dr. Jefferson did not respond.

Yet Phillips did not file another sick-call request with the prison medical staff seeking additional care for the mass or his pain. Instead, in June 2016, Phillips sued Dr. Tangilag, Correct Care Solutions, Dr. Lester Lewis (the regional medical director for this entity), and Dr. Jefferson. The district court denied his request for a preliminary injunction, reasoning that he could seek follow-up care from the prison at any time.

The court's decision led Phillips to do just that. Medical staff ordered another ultrasound, which found nothing remarkable. Phillips was given pain medication and referred to physical therapy. He participated in that therapy for weeks. Although Phillips at one point found that it

was "helping," Notes, R.164, PageID 2006, the physical therapist eventually discharged him because he had "plateaued" and continued to believe that he would not get better without "that surgery the one doctor said I needed," Notes, R.160-6, PageID 1311–12.

A short time later, Phillips saw a nurse for his leg. She recommended that Phillips continue pursuing physical therapy and taking pain medication "in keeping with the latest evidence based practice." Notes, R.160-8, PageID 1318. During the meeting, the nurse asked for an opinion from Dr. Angela Clifford, another doctor employed by Correct Care Solutions. Clifford reiterated that a plantaris rupture was not an injury on which surgeons operate. Although Clifford does not remember the conversation, the nurse's notes suggest that she further opined: "This happened in 2014 and if it was to be fixed it should have been done" at that time. Notes, R.160-8, PageID 1317. When Clifford made this comment, Phillips asked for her name so that he could call her as a witness (on the theory that the comment showed that he had not received proper care in 2014). According to Phillips, Clifford "went ballistic" in response, saying that "she could not abide people like" him who were just trying to get money. Phillips Dep., R.173-1, PageID 2503, 2507.

Phillips filed an amended complaint adding Dr. Clifford as a defendant. He alleged that Dr. Tangilag, Dr. Lewis, Dr. Clifford, Correct Care Solutions, and Dr. Jefferson (as well as two now-irrelevant defendants) had been deliberately indifferent to his medical needs in violation of the Eighth Amendment. He also alleged that Correct Care Solutions and its doctors had denied him care because of this suit in violation of the First Amendment. He lastly raised a state-law malpractice claim.

In a trio of decisions, the district court granted summary judgment to all defendants. *Phillips v. Tangilag*, 2020 WL 5665080, at *2–5 (W.D. Ky. Sept. 23, 2020) (Dr. Tangilag); *Phillips v. Tangilag*, 2020 WL 5413783, at *2–5 (W.D. Ky. Sept. 9, 2020) (Correct Care Solutions, Dr. Lewis, and Dr. Clifford); *Phillips v. Tangilag*, 2020 WL 5223310, at *2–7 (W.D. Ky. Sept. 1, 2020) (Dr. Jefferson). The court also denied Phillips's motion to avoid paying $500 in expert fees for the deposition of Dr. Jefferson's expert. *Phillips v. Tangilag*, 2020 WL 6276265, at *1–3 (W.D. Ky. Oct. 26, 2020). Phillips now appeals the court's rulings on his

Eighth Amendment claim, his First Amendment claim, his state-law malpractice claim, and the expert-fees issue.

## II.  Eighth Amendment

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The Supreme Court has held that a state can run afoul of the ban on "cruel and unusual punishments" by failing to give prisoners the medical care that they need to prevent "pain and suffering" from their health conditions.  *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *cf. Bucklew v. Precythe*, 139 S. Ct. 1112, 1122–24 (2019).  To prove this type of claim under 42 U.S.C. § 1983, a prisoner must show both that a defendant acted under color of state law and that the defendant was deliberately indifferent to the prisoner's serious medical needs.  *See West v. Atkins*, 487 U.S. 42, 48–49 (1988).  This case implicates both elements.  Dr. Jefferson argues that he did not act under color of state law, and all of the defendant doctors argue that they did not act with deliberate indifference.

### A

Dr. Jefferson asserts that he provided health care to Phillips as a private doctor, not a Kentucky official.  The Eighth Amendment has been incorporated against the states through the Fourteenth Amendment.  *See Robinson v. California*, 370 U.S. 660, 666 (1962).  But the Fourteenth Amendment still applies only to state—not private—conduct.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982).  Did Dr. Jefferson become a "state" actor merely by treating a state prisoner like Phillips?  Different factors point in different directions.

For starters, an individual need not be a formal "public employee" to qualify as a state actor because governments have long carried out their duties using private agents.  *See United States v. Miller*, 982 F.3d 412, 422 (6th Cir. 2020).  To decide whether a seemingly private party is a "state" actor, the Supreme Court has applied different tests in different settings.  *Id.*  In this prison setting, the Court has opted for a "public-function" test.  *See West*, 487 U.S. at 55–56; *Carl v. Muskegon County*, 763 F.3d 592, 595 (6th Cir. 2014).  It has recognized that the states can privatize most functions (like the provision of electricity or education) without turning the

parties who take on these tasks into "government" agents. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–29 (2019). Yet a few public functions—those the government has "traditionally *and* exclusively" performed—cannot be delegated to private parties in this way without the Constitution's limits accompanying the delegation. *Miller*, 982 F.3d at 423 (citation omitted).

The Court has extended this public-function logic to some doctors who care for prisoners. The Constitution does not generally impose a positive duty on states to offer medical care to those within their jurisdictions. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). When, however, a state imprisons individuals and deprives them of the liberty to care for themselves, it takes on a "duty" through the Eighth Amendment to ensure their well-being. *Id.* at 199–200. And states may not entirely outsource this constitutional duty to a private entity. *Halleck*, 139 S. Ct. at 1929 n.1. The Supreme Court thus held that an orthopedic specialist became a state actor when he operated a clinic providing twice-a-week care to inmates at a prison hospital. *West*, 487 U.S. at 44, 56–57. Although this doctor saw many other patients, he had "voluntarily assumed" the state's "obligation to provide adequate medical care to" inmates by entering into a contract for that care. *Id.* at 56–57. Our court likewise held that a psychiatrist who saw a pretrial detainee was a state actor because she offered her services under a formal agreement with the county. *See Carl*, 763 F.3d at 596–97. (Given these decisions, the doctors in this case who worked for Correct Care Solutions do not dispute that they were state actors.)

At the same time, private parties do not automatically become "state" actors simply by caring for prisoners. Consider a hospital with an emergency room that generally must treat all patients who seek care for life-threatening conditions. *See* 42 U.S.C. § 1395dd. Does this hospital become a state actor whenever a prisoner gets rushed there for a medical emergency? The Seventh Circuit has held to the contrary, reasoning that the hospital had not voluntarily agreed to accept the state's "special responsibility" to its prisoners. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827–28, 831 (7th Cir. 2009).

We have likewise emphasized the lack of a contract between a state and a doctor when finding that the doctor was not a state actor. *See Scott v. Ambani*, 577 F.3d 642, 649 (6th Cir.

2009).   In *Scott*, a prison doctor referred an inmate with cancer to an outside hospital for radiation treatment.   *Id.* at 645, 649.   We found that the hospital oncologist who treated the prisoner was not a state actor because there was "no contractual relationship" between the oncologist and the state.   *Id.* at 649.   The prison doctor had referred the patient to the hospital generally, so the prisoner could have been treated by any of the staff oncologists.   *Id.*   The state also had no influence over the oncologist's care of the prisoner; she decided on the proper treatment based solely on "her own training, experience, and independent medical judgment." *Id.*

This case falls somewhere between these decisions.   On the one hand, Dr. Jefferson is a private orthopedic surgeon who saw Phillips at his private office and who spoke with Dr. Tangilag about Phillips's MRI.   That was the extent of his participation in Phillips's care.   Unlike the doctors in *West* and *Carl*, Jefferson had no written contract with Kentucky to provide care to its prisoners.   Instead, Phillips was referred to Jefferson in the same way that any ordinary patient might be referred to him.   In *West*, moreover, the Supreme Court emphasized that the doctor had performed his duties "at the state prison," which the Court thought would inevitably affect the doctor's care.   487 U.S. at 56 n.15; *see Rodriguez*, 577 F.3d at 826–27.   Here, by contrast, no evidence suggests that Phillips's status as a prisoner affected Dr. Jefferson's care.   *See Scott*, 577 F.3d at 649.   As a practical matter, moreover, treating Dr. Jefferson as a state actor with potential liability under § 1983 (on top of the ordinary tort liability that he faces for all patients) might make specialists reluctant to treat prisoners.   Dr. Jefferson, for example, suggested that his "willingness to see the prisoners" is the main reason he got such referrals.   Jefferson Dep., R.56-5, PageID 497.   It would be ironic if the constitutional protections designed to help prisoners ended up harming them.

On the other hand, Dr. Tangilag referred Phillips specifically to Dr. Jefferson.   This fact distinguishes Jefferson from the oncologist in *Scott*, who cared for the prisoner by happenstance because the referral had been to the hospital.   *See Scott*, 577 F.3d at 649.   This fact also makes this case resemble *Conner v. Donnelly*, 42 F.3d 220 (4th Cir. 1994).   There, the Fourth Circuit held that an orthopedic physician was a state actor when he treated a prisoner at his private office pursuant to a prison doctor's referral.   *See id.* at 225–26.   The court reached this result even

though the state and physician had no written contract. *See id.* Here, moreover, Jefferson knew that Phillips was a prisoner when he accepted the referral and so could be said to have in some respects assumed the state's duty to provide medical care. *See West*, 487 U.S. at 56.

At day's end, we opt not to decide whether Dr. Jefferson qualified as a state actor. Even if he did, Phillips has not shown that he was deliberately indifferent to Phillips's serious medical needs. We thus can resolve this appeal solely on the deliberate-indifference element.

B

The Eighth Amendment bars state actors from wantonly inflicting pain on prisoners. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986). The conduct that meets this "wantonness" test depends on the circumstances. *See Hudson v. McMillian*, 503 U.S. 1, 5, 8 (1992). Sometimes, a state official must intend to harm a prisoner "maliciously and sadistically," as when a guard claims to have used force to maintain order. *Id.* at 7. Other times, the official must act only with "deliberate indifference" to the risk of harm—whether the risk comes from another inmate's violence, *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994), the prison's conditions, *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), or, as relevant here, the inmate's health problems, *Estelle*, 429 U.S. at 103–04.

This deliberate-indifference test has objective and subjective parts. *See Beck v. Hamblen County*, 969 F.3d 592, 600 (6th Cir. 2020). The first part asks an objective question: Did the prisoner face a risk of sufficiently serious harm? *See Farmer*, 511 U.S. at 834. The need to surpass this "seriousness" threshold follows from the Eighth Amendment's "cruel and unusual" language. A state does not behave in a cruel and unusual fashion simply because it provides uncomfortable prisons, *see id.* at 832; it behaves in that fashion only if it deprives prisoners of "the minimal civilized measure of life's necessities," *Wilson*, 501 U.S. at 298 (citation omitted).

To prove this objectively serious harm in the health context, prisoners must first establish that they have "serious medical needs." *Estelle*, 429 U.S. at 106. They can do so, for example, by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care. *See Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013). A serious medical need alone can satisfy this objective

element if doctors effectively provide no care for it.  *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

More frequently, doctors provide some care and prisoners challenge their treatment choices as inadequate.  To establish the objective element in this common situation, prisoners must show more.  *See Anthony v. Swanson*, 701 F. App'x 460, 463–64 (6th Cir. 2017); *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013).  Objectively speaking, this care qualifies as "cruel and unusual" only if it is "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness."  *Rhinehart*, 894 F.3d at 737 (quoting *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir. 2005)).  Ordinary individuals outside a prison's walls and inmates within those walls both face a risk that their doctors will perform incompetently.  That is why the states have adopted a well-established body of tort law to remedy the harms caused by medical malpractice.  But mere malpractice does not violate the Eighth Amendment.  *See Estelle*, 429 U.S. at 106.  Only grossly or woefully inadequate care—not just care that falls below a professional standard—can be called "cruel and unusual." *See Rhinehart*, 894 F.3d at 737; *Jones v. Muskegon County*, 625 F.3d 935, 945–46 (6th Cir. 2010); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021); *Hoffer v. Sec'y, Fla. Dep't of Corrs.*, 973 F.3d 1263, 1271 (11th Cir. 2020). This test avoids turning the Eighth Amendment into a federal malpractice statute.  *Cf. Burgess*, 735 F.3d at 476.

For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony.  *See Rhinehart*, 894 F.3d at 737, 740–43; *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).  This medical-evidence requirement makes sense in a world in which the Supreme Court looks to the "evolving standards of decency" to determine the Eighth Amendment's standards.  *Estelle*, 429 U.S. at 106.  Even for garden-variety negligence claims, "[t]he overwhelming weight of authority supports the view that ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon."  H.H. Henry, Annotation, *Necessity of Expert Evidence to Support an Action for Malpractice Against a Physician or Surgeon*, 81 A.L.R. 2d 597, § 2 (1962 & Supp. 2021) (collecting cases).  So a medical-evidence requirement sits

comfortably within society's "decency" standards.  And it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim.

Only if a prisoner proves this objective element must courts consider the second (subjective) part of the deliberate-indifference test.  This part asks: Did the official know of and disregard the serious medical need?  *See Farmer*, 511 U.S. at 834, 838–39.  It follows from the Eighth Amendment's "inflict[ion]" of "punishments" language.  *See Griffith v. Franklin County*, 975 F.3d 554, 568 (6th Cir. 2020).  Accidental harms do not "inflict" "punishment."  *See Wilson*, 501 U.S. at 300.  An official must cause the harm with a sufficiently culpable mental state—in this context, criminal recklessness.  *See Santiago*, 734 F.3d at 591.  The criminal-recklessness standard considers the official's state of mind about the risk of harm and about the response to the risk.  *See id.*  In this healthcare setting, a doctor must first know of the facts that show the serious medical need and must personally conclude that this need exists.  *See Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018); *Rouster v. County of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014).  The doctor's response next must "consciously disregard[]" the need.  *Jones*, 625 F.3d at 941.

\*

Because § 1983 does not permit a plaintiff to impose vicarious liability on a defendant for another defendant's actions, Phillips must independently establish these objective and subjective elements for each doctor that he has sued: Drs. Tangilag, Jefferson, Clifford, and Lewis.  *See Beck*, 969 F.3d at 600.  Yet he has failed to establish his deliberate-indifference claim against all of these doctors for the same universal reason: he cannot prove the objective element of his claim because he lacks any expert medical evidence showing that he received grossly inadequate care.

Even if the softball-size lump on Phillips's calf was a "serious medical need," he received substantial care for it.  Dr. Tangilag first ordered an ultrasound and then a CT scan (primarily to rule out cancer).  Once she learned the lump was caused by a plantaris rupture rather than cancer, she thought it would go away on its own, "[k]ind of like a normal bruise."  Tangilag Dep., R.173-5, PageID 2741.  To play it safe, though, she referred Phillips to a specialist, Dr. Jefferson.

Jefferson confirmed the plantaris rupture and attempted to drain the hematoma before recommending an MRI. Tangilag consulted with Jefferson about the MRI results. Both doctors agreed that the hematoma was shrinking and would likely disappear. To alleviate his pain, Tangilag advised Phillips to apply moist heat to his leg twice a day. After Phillips's last meeting with Tangilag, Phillips did not file another sick-call request until well after he sued. He was then given another ultrasound, physical therapy, and pain medication, and Dr. Clifford reiterated why surgery was improper.

This undisputed evidence shows that Phillips received extensive care. He thus cannot rely on his serious medical needs alone to establish the objective element of his deliberate-indifference claim. *See Anthony*, 701 F. App'x at 463–64. Rather, because he challenges the adequacy of this undisputed care, he must show that the doctors provided grossly incompetent treatment. *See Rhinehart*, 894 F.3d at 737; *Jones*, 625 F.3d at 945–46. Yet how is a lay jury supposed to know what type of care was objectively proper for a hematoma caused by a plantaris rupture? *See Anthony*, 701 F. App'x at 464. Is surgery the proper course? Or a less invasive option? Phillips needed to present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so. *See id.*; *see also Rhinehart*, 894 F.3d at 737–38. But Phillips failed to introduce any such medical evidence.

Indeed, the only medical testimony confirms the propriety of the care Phillips received. A defense expert opined that plantaris ruptures "are treated in a conservative" fashion and that the "standard of care" is not surgery. Finnan Op., R.147-2, PageID 1163. He opined further that surgeons "rarely" operate to evacuate a hematoma caused by the rupture. *Id.* His opinion comported with the professional judgments of Drs. Jefferson and Tangilag. As Dr. Jefferson explained, people do not need their plantaris to function normally, and the muscle sits deep in the leg so surgery could cause more harm than good. He acknowledged that this type of rupture may cause internal bleeding, but the resulting hematoma typically goes away "without incident." Jefferson Dep., R.56-5, PageID 517. He was "not aware" of such a mass ever failing to resolve by itself. *Id.*, PageID 518. Jefferson analogized to long-distance runners who regularly suffer plantaris ruptures. They have a lot of pain and internal bleeding shortly after the rupture but are

back to running marathons in three to six months without surgery. Dr. Tangilag likewise noted that surgery was not appropriate because the risks of cutting deep into the leg were not worth the benefits of evacuating any remaining blood.

A comparison of this case's facts with those in the Supreme Court's *Estelle* decision shows how far short Phillips's claim falls. In that case, the prisoner's complaint alleged that he continued to suffer from debilitating back pain after a bale of cotton fell on him. 429 U.S. at 99–100. When he sought medical treatment, the medical staff gave him only pain medication and muscle relaxers; they did not even order an x-ray or other similar diagnostic test to figure out what was wrong. *Id.* at 99–100, 107. The Supreme Court held that these allegations did not suffice to state a claim at the pleading stage. *Id.* at 107. It reasoned that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Id.* Here, by contrast, the doctors ordered many expensive tests, identified the problem, and followed a treatment plan provided to most people who suffer similar injuries outside a prison. Phillips has no evidence that the course of treatment was incompetent, let alone grossly so. His deliberate-indifference claim thus cannot get past the objective stage.

One last point: Phillips also brought an Eighth Amendment claim against Correct Care Solutions. To hold this entity liable, he needed to establish that one of its customs or policies caused the underlying Eighth Amendment violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). Without any evidence of such a constitutional violation, however, Phillips's claim against this entity must fail too. *See Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017).

\*

In response, Phillips argues that our cases did not require him to present expert testimony because he had an "obvious" need. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 897–900 (6th Cir. 2004). He places undue reliance on *Blackmore*. It asked only whether a prisoner must present "verifying medical evidence" (e.g., expert testimony) to show a serious medical need. *Id.* at 893 (quoting *Napier*, 238 F.3d at 742). We have held that obviously

serious problems—such as the *Blackmore* prisoner's sharp stomach pain and vomiting over two days—do not require this evidence. *See id.* at 894, 897–98. And we have contrasted these problems with the "minor or non-obvious" maladies that do. *Santiago*, 734 F.3d at 590 (citation omitted).

This debate over how to prove a "serious medical need" is beside the point. We can assume that the mass on Phillips's leg showed that need. Unlike in this case, no treatment decisions were at issue in *Blackmore*. There, the prisoner sued sheriff's deputies who did not seek medical intervention despite his severe pain. *Blackmore*, 390 F.3d at 893 n.1, 894. We held that a jury could find it "obvious" that these (non-medical) deputies should have requested medical help sooner. *Id.* at 900. (When they did, a nurse diagnosed appendicitis and sent the prisoner to surgery. *Id.*) In this case, by contrast, Phillips received substantial care and challenges the medical judgments of medical professionals. Our cases require expert testimony for this different type of challenge—as *Blackmore* recognized. *Id.* at 898; *see also Anthony*, 701 F. App'x at 464.

Phillips counters that our cases also do not require medical evidence to prove the objective element of a deliberate-indifference claim if a prisoner receives such "cursory" treatment that it effectively amounts to no care. *Rhinehart*, 894 F.3d at 737 (citation omitted). Yet medical staff examined Phillips's leg, provided a slew of diagnostic tests, identified the source of the problem, sent him to a specialist, and determined that the problem would resolve on its own. When staff were informed that it had not done so, they provided more care. An ultrasound found nothing extraordinary. Medical staff then put Phillips in physical therapy and gave him pain medication. This treatment cannot be described as "cursory."

Even if he needed to present expert testimony, Phillips next argues, he did so in the form of concessions from Drs. Jefferson and Tangilag. The doctors believed that the hematoma was going away but agreed that Phillips should be reassessed if he did not improve. Because the doctors did not reassess his leg, Phillips argues, they violated what they viewed to be the standard of care. His argument has factual and legal flaws. Factually, Phillips ignores the reason why he did not get reevaluated: he did not file another sick-call request seeking care for his leg for over two years after he last saw Dr. Tangilag in August 2015. He even affirmatively declined

treatment at one point: Phillips discussed his leg with another doctor during a visit for hearing problems in 2017, but he was "hesitant to have it addressed" because of this suit.  Notes, R.164, PageID 2012.  When he later went through the proper channels, he was reassessed.

That may be so, Phillips responds, but Dr. Tangilag acted incompetently because she did not *tell* him to file a sick-call request if his condition did not improve.  There is a dispute of fact on this question.  While she testified that she "may" have done so, her notes record no such statement.  Tangilag Dep., R.173-5, PageID 2747.  But this factual dispute does not matter.  Even if Dr. Tangilag did not convey this information, Phillips lacks any medical evidence showing that the standard of care required her to clarify what she viewed to be obvious.  As she put it, Phillips had the responsibility to communicate to medical staff if he did not improve just as "any normal individual" outside prison must do.  *Id.*, PageID 2757.

Phillips adds that Dr. Jefferson did nothing in response to his letter stating that the mass remained on his leg about three months after their visit.  This fact does not allow Phillips to avoid the need for expert medical evidence.  What is the standard of care for a specialist who is referred a patient, provides care, and returns the patient to the primary provider?  According to Jefferson, he gets lots of these letters, but the prison doctors must refer prisoners to him.  Jefferson Dep., R.56-5, PageID 508; *see also Vreeland v. Fisher*, 2014 WL 4854739, at *5 (D. Colo. Sept. 29, 2014), *aff'd* 682 F. App'x 642 (10th Cir. 2017); *Wright v. Genovese*, 694 F. Supp. 2d 137, 156 (N.D.N.Y. 2010), *aff'd* 415 F. App'x 313 (2d Cir. 2011) (order).  Phillips cites no contrary evidence on what the standard of care required of Jefferson.

Regardless, Phillips's reliance on the testimony of these two doctors has a fatal legal problem.  He at most has shown that they caused a *delay* in the reassessment until 2018.  But this type of claim (that doctors delayed care) typically requires expert medical testimony too.  Phillips needed to "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment."  *Santiago*, 734 F.3d at 590 (quoting *Napier*, 238 F.3d at 742).  But he presented no medical evidence showing that any delay in the reassessment exacerbated any harm.  There is no evidence, for example, that surgery would have been proper if the prison staff had reevaluated him sooner.  Even Dr. Clifford—who allegedly said that Phillips's leg should have been "fixed" back in 2014 (if at all)—had "[a]bsolutely" no criticisms

with the care he received.  Notes, R.160-8, PageID 1317; Clifford Dep., R.173-2, PageID 2573.  Phillips's Eighth Amendment claim thus fails for lack of the required expert medical evidence.

## III.  First Amendment

Phillips next alleges that a jury could conclude that Dr. Tangilag, Dr. Lewis, and Correct Care Solutions violated the First Amendment by refusing to treat his leg in retaliation for his decision to file this suit.  This type of retaliation claim requires a prisoner to establish three well-known elements: that the prisoner engaged in activity protected by the First Amendment, that the defendant took a harmful action against the prisoner, and that the action was caused by the prisoner's protected activity.  *See King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  For this claim, too, § 1983 requires a prisoner to establish these elements against each individual defendant.  *See Beck*, 969 F.3d at 600.  And the statute requires the prisoner to show that a corporate defendant's policy or custom caused the First Amendment violation.  *See Street*, 102 F.3d at 818.

Without opining on the first two elements of Phillips's claim, we can resolve his appeal on the third.  Undisputed evidence shows that Phillips's lawsuit did not cause Drs. Tangilag and Lewis (or any other provider) to deny him care for his leg.  After his last visit with Dr. Tangilag in August 2015, Phillips did not submit another request for treatment until April 2018.  Any lack of care from the time that he sued in June 2016 to the time that he submitted this request has an obvious source: his failure to ask for care.  When he submitted the request, moreover, he received care.  So nothing suggests that any doctor denied Phillips care because of his suit.  And without the causation evidence necessary to prove a First Amendment violation by the individual doctors, Phillips's claim against Correct Care Solutions fails too.  *See Thomas*, 854 F.3d at 367.

Phillips does not respond with evidence.  He responds with a statement by the defendants' lawyers in their opposition to his preliminary-injunction motion.  The opposition stated: "Phillips is, and always was, free to submit a healthcare request and have his care providers reassess the mass in his left calf—but he chose not to do so—preferring litigation instead."  Opp., R.57, PageID 536.  Phillips reads into this statement the veiled threat that staff would not treat him because of this suit.  To the contrary, the brief went on to explain that an

injunction ordering prison staff to treat Phillips's leg was not "necessary" because the staff would offer care if Phillips asked for it (as they subsequently did). *Id.* Phillips's claim thus fails on causation grounds.

## IV.  Kentucky Malpractice Law

Having exhausted his federal claims, Phillips turns to a malpractice claim under state law. Kentucky requires patients alleging malpractice to prove the same basic elements of any common-law negligence claim. They must show that a doctor owed a duty to a patient. They must show that the doctor breached this duty by providing services that fell below the medical community's standard of care. They must show that the patient was injured. And they must show a causal connection between the breach and the injury. *See, e.g.*, *Jones v. Gaes*, 2011 WL 1642225, at *3 (Ky. Apr. 21, 2011); *Ashcraft v. Kennedy*, 2015 WL 1304171, at *3 (Ky. Ct. App. Mar. 20, 2015).

Unlike with other kinds of negligence claims, however, Kentucky courts generally require patients to introduce expert medical evidence to establish the breach and causation elements of this special negligence claim. *See, e.g.*, *Adams v. Sietsema*, 533 S.W.3d 172, 179 (Ky. 2017); *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010); *Estes v. King's Daughters Med. Ctr.*, 59 F. App'x 749, 755 (6th Cir. 2003). Lay jurors typically cannot answer medical questions about whether a defendant doctor adhered to the healthcare community's standard of care or scientific questions about whether the failure to live up to that standard caused any injuries. *See Adams*, 533 S.W.3d at 179. How would jurors know when a doctor should order an x-ray? *See Turner v. Reynolds*, 559 S.W.2d 740, 741 (Ky. Ct. App. 1977). Or whether an improper delay in the diagnosis of a stroke exacerbated the harm from the stroke? *See Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 578–79 (Ky. 2019). Poor outcomes alone cannot establish these elements. *See Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992). After all, such outcomes will often happen even when a doctor performs admirably (as when, say, an emergency-room doctor does everything possible to save a patient who dies from an unexpected heart attack).

These principles seem to make this case easy. Phillips introduced no expert evidence about whether the defendant doctors violated any medical standard of care or whether their purported malpractice caused any injury. His claim thus presumably fails, as many have, for lack of the required expert evidence. *See, e.g.*, *Ashland*, 581 S.W.3d at 580; *Estes*, 59 F. App'x at 757.

According to Phillips, his case is not so simple. He argues that its facts qualify for one of Kentucky's two exceptions to the general expert-evidence requirement. Under the "*res ipsa loquitur*" exception, a patient does not need expert testimony about the standard of care if an ordinary person could conclude that a certain result would not happen if the doctor had performed with the proper skill. *See Perkins*, 828 S.W.2d at 655. Think of a surgeon who leaves a scalpel blade in a patient's body. *See City of Somerset v. Hart*, 549 S.W.2d 814, 817 (Ky. 1977). But nothing of the sort occurred here. Although Phillips alleges that he continues to suffer pain, that allegedly poor result does not suffice by itself. *See Perkins*, 828 S.W.2d at 655. And he identifies no other conduct or facts that could be explained by negligence alone.

Under the party-admission exception, a patient does not need expert testimony if a doctor's own admissions would permit a jury to find both that the doctor violated the standard of care and that this malpractice caused the injury. *See Perkins*, 828 S.W.2d at 655; *Colo'n v. Norton Hosps., Inc.*, 2016 WL 749490, at *3 (Ky. Ct. App. Feb. 26, 2016). Yet none of the doctors in this case admitted that they behaved negligently or caused harm to Phillips. At most, they admitted that Phillips should be reassessed if the hematoma did not improve. But, as noted, his failure to receive a reassessment arose from his delay in seeking further care. Besides, no expert evidence shows that any delay in care caused Phillips any injuries. *See Jones*, 2011 WL 1642225, at *3.

That leaves Phillips with the claim that we should create a third exception to the expert-evidence requirement for doctors who "abandon" their patients (as he alleges occurred here). Phillips justifies this exception with *Johnson v. Vaughn*, 370 S.W.2d 591 (Ky. 1963). In that case, an intoxicated doctor failed to properly care for a gunshot victim admitted to the hospital in the dead of night. *Id.* at 594, 596. The doctor left the victim at the hospital and later demanded payment before releasing the victim into the care of another surgeon trying to save his

life. *See id.* at 595, 597. The court held that this drunk doctor's abandonment of a patient struggling to survive violated the standard of care. *Id.* at 596–97. But it did not create an exception to the expert-evidence requirement; it relied on the surgeon's testimony. *Id.*; *see also Ashcraft*, 2015 WL 1304171, at *2–4. Phillips's lack of expert evidence thus dooms his malpractice claim.

## V. Expert Fees

Phillips ends with the claim that the district court wrongly required him to pay some of the fees of Dr. Jefferson's expert witness—Dr. Zack Stearns. Jefferson responds with a jurisdictional argument and a merits argument. He is wrong on jurisdiction but right on the merits.

### A

Jefferson's jurisdictional argument necessitates some procedural background. The Federal Rules of Civil Procedure allow a party to depose an opponent's expert. Fed. R. Civ. P. 26(b)(4)(A). But this right comes with a catch: "the party seeking discovery" generally must "pay the expert a reasonable fee for time spent in responding to discovery[.]" Fed. R. Civ. P. 26(b)(4)(E). After Phillips deposed Dr. Stearns, Stearns asked him for $1,800 in fees. Claiming that Stearns overcharged him by $500, Phillips sought to avoid this amount. A magistrate judge denied his motion and ordered him to pay the full $1,800.

Even though the parties had objections pending to the magistrate judge's decision on this expert-fees issue, the district court issued its final judgment on September 23, 2020. On October 21, Phillips filed a notice of appeal on the merits and on the expert-fees issue. Jefferson countered with a motion in our court seeking to dismiss the appeal on the fees issue because the district court had yet to rule on it. The court affirmed the magistrate judge's decision in the meantime on October 26. On November 2, Phillips filed an amended notice of appeal including this fees decision.

At first blush, these facts look like they comfortably secure our jurisdiction. A decision is "final" and so appealable under 28 U.S.C. § 1291 even if a district court must still resolve a

motion about attorney's fees or other costs. *See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs*, 571 U.S. 177, 184 (2014); *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 775–76 (6th Cir. 2020); Fed. R. Civ. P. 58(e). The district court thus correctly recognized that it could issue a final judgment even with this expert-fees issue pending. Phillips timely filed a notice of appeal within 30 days of that judgment. *See Bowles v. Russell*, 551 U.S. 205, 208–09 (2007). But this initial appeal could not cover the expert-fees issue because it had yet to become "final." Phillips thus had thirty days to appeal from the court's later decision on the expert-fees issue. *See, e.g.*, *Avila v. L.A. Police Dep't*, 758 F.3d 1096, 1104 n.8 (9th Cir. 2014); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1250 (10th Cir. 1999); *Leahy v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 912 F.2d 917, 923 (7th Cir. 1990); 16A Charles A. Wright et al., *Federal Practice and Procedure* § 3949.4, at 144–50 (5th ed. 2019). He filed an amended notice of appeal within the required time.

Jefferson nevertheless claims that we lack jurisdiction because this second notice of appeal did not comply with the technicalities of the Federal Rules of Appellate Procedure. Those rules delay the time for appealing from an otherwise final judgment if a party files one of six motions, including a motion for judgment as a matter of law or for a new trial. Fed. R. App. P. 4(a)(4)(A). The rules then explain that if a party files a premature notice of appeal while one of these motions remains pending, the notice "becomes effective" after the court's ruling on the motion. Fed. R. App. P. 4(a)(4)(B)(i). If the party also seeks to appeal this later ruling, though, the party must file "an amended notice of appeal" that adds it. Fed. R. App. P. 4(a)(4)(B)(ii). But "[n]o additional fee is required to file an amended notice." Fed. R. App. P. 4(a)(4)(B)(iii). Because Phillips's expert-fees motion is not one of the six motions listed in Rule 4(a)(4)(A), Jefferson argues, Phillips needed to file a *separate* notice of appeal and pay a separate filing fee; he could not simply file an *amended* notice without another fee.

"There is little caselaw discussing the distinction between an amended and a new notice of appeal." 16A Wright, *supra*, § 3949.4, at 153 n.52. And while Jefferson is right that Phillips's motion was not one of the six listed in Rule 4(a)(4)(A), the rules nowhere preclude other types of amended notices. Suppose, for example, that an appellant seeks to appeal one

order in a notice of appeal filed after a final judgment, but later opts to appeal a second order within the 30-day window. The Fifth Circuit has also held that appellants never need to pay an additional fee for an amended notice of appeal—whether the amendment relates to one of the motions listed in Rule 4(a)(4)(A) or to something else entirely. *See Owen v. Harris County*, 617 F.3d 361, 363 (5th Cir. 2010); *see also Anderson v. Equinox Holdings, Inc.*, 813 F. App'x 308, 309 (9th Cir. 2020) (mem.). This logic suggests that amended notices can cover more than the six motions in Rule 4(a)(4)(A).

Ultimately, though, we need not determine whether Phillips should have filed a separate notice or an amended one. Jefferson is wrong to suggest that this debate affects our jurisdiction. Even a document that is not entitled a "notice of appeal" may establish our jurisdiction if it includes the information required by Federal Rule of Appellate Procedure 3 and is filed within the time required by Federal Rule of Appellate Procedure 4. *See Becker v. Montgomery*, 532 U.S. 757, 767 (2001); *Smith v. Barry*, 502 U.S. 244, 247–50 (1992); *Alemarah v. Gen. Motors, LLC*, 980 F.3d 1083, 1088 (6th Cir. 2020) (per curiam); Fed. R. App. P. 3(a)(2), (c)(4). Here, Phillips timely filed the second notice, and it included the required information. *Cf. Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 849 (7th Cir. 2012). The filing fee likewise does not affect our jurisdiction. *See Parissi v. Telechron*, 349 U.S. 46, 47 (1955) (per curiam). So the second notice of appeal gives us jurisdiction over this issue, whether Phillips should have filed a new notice or an amended one.

B

On the merits, Phillips agrees that he needed to pay Dr. Stearns something for his deposition but claims that he was overcharged. Stearns charged him $1,800 for two hours of work in conjunction with his deposition ($800 for the first hour, $250 for each additional 15 minutes). Phillips objected to paying for more than 1.5 hours of time ($1,300) because the deposition began at 11:09 a.m. and ended at 12:42 p.m. The district court denied his objection because experts may seek payment for "preparation time" outside their formal deposition. *Phillips*, 2020 WL 6276265, at *3. On appeal, we review the ultimate expert-fees award for an abuse of discretion. *See Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 884 (7th Cir. 2020); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355–56 (5th Cir. 2007); *cf. Ne. Ohio*

*Coal. for the Homeless v. Husted*, 831 F.3d 686, 702–03 (6th Cir. 2016). That well-known standard triggers de novo review for legal issues and clear-error review for factual ones. *See, e.g.*, *Begley v. Sec'y of Health & Hum. Servs.*, 966 F.2d 196, 199 (6th Cir. 1992).

Phillips starts with a legal issue. He reads Federal Rule of Civil Procedure 26(b) as permitting expert fees only for the time during the formal deposition, not for the time preparing for the deposition. Both text and precedent refute this narrow view. Rule 26(b)(4)(A) allows a party to "depose any person who has been identified as an expert whose opinions may be presented at trial." Rule 26(b)(4)(E) then indicates: "Unless manifest injustice would result, the court must require that the party seeking discovery . . . pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A)[.]" This text is not limited to an expert's time in the deposition; it covers the expert's "time spent in responding to discovery." The time spent preparing for a deposition falls within this language. So all of the circuit courts to have considered this question have held that experts may seek compensation for deposition preparation. *See Halasa*, 690 F.3d at 852; *Knight*, 482 F.3d at 356; *Haarhuis v. Kunnan Enters., Ltd.*, 177 F.3d 1007, 1015 (D.C. Cir. 1999). (A district court, of course, retains the authority to reject an expert's "unreasonable" claims about preparatory time. *See* 8A Charles A. Wright et al., *Federal Practice and Procedure* § 2034, at 132–38 (3d ed. 2010).)

Falling short on his legal claim, Phillips turns to a factual one. He argues that he should not have to pay Dr. Stearns for any preparatory time because the doctor seemed totally unprepared at the deposition. Yet Dr. Stearns indicated that he had written his expert report a long time before the deposition and had to go "back over everything" for the deposition. Stearns Dep., R.173-4, PageID 2659. The district court thus had a plausible evidentiary basis to find that Stearns engaged in the small amount of preparation for which he was compensated. That conclusion dooms this factual challenge under our deferential clear-error standard of review. *See Cook v. Greenleaf Township*, __ F. App'x __, 2021 WL 2433444, at *4 (6th Cir. June 15, 2021).

Phillips next argues that he should not have to pay for the eight or so pages of deposition testimony in which counsel for Dr. Jefferson (rather than his own counsel) questioned Stearns. We opt not to decide whether Rule 26(b) requires a litigant to pay for any periods during a deposition in which experts are questioned by counsel for the party who retained them. Even if

this small amount of time were not compensable, the district court would not have clearly erred in finding that Dr. Stearns spent a total of two hours performing activities that were compensable under Rule 26(b)(4)(E).

Phillips lastly complains that Dr. Stearns charged Phillips a higher rate for his deposition than Stearns charged Dr. Jefferson for his time. But the district court never considered Stearns's rate because Phillips made only a passing reference to it in the "background" section of his district-court brief. Obj., R.201, PageID 3081. This perfunctory analysis in the district court did not suffice to preserve the issue for our review on appeal. *See AtriCure, Inc. v. Meng*, __ F.4th __, 2021 WL 3823418, at *10 (6th Cir. Aug. 27, 2021).

We affirm.