RENDERED:  JUNE 25, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2024-SC-0216-DG

DIAGNOSTIC X-RAY PHYSICIANS, PSC
(DXP); CHRISTOPHER DALE HENLEY
M.D.; AND DARREN CAIN M.D.

APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.                     NO. 2023-CA-0748
JEFFERSON CIRCUIT COURT NO. 20-CI-005331

DEBORAH LLOYD; NORTON
HOSPITALS, INC. D/B/A NORTON'S
WOMEN'S AND CHILDREN'S
HOSPITAL; AND SHEILA SLONE KCSA

APPELLEES

AND

### 2024-SC-0224-DG

SHEILA SLONE KCSA

APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                     NO. 2023-CA-0748
JEFFERSON CIRCUIT COURT NO. 20-CI-005331

DEBORAH LLOYD; CHRISTOPHER
DALE HENLEY M.D.; DARREN CAIN
M.D.; DIAGNOSTIC X-RAY
PHYSICIANS, PSC (DXP); AND
NORTON HOSPITALS, INC. D/B/A
NORTON'S WOMEN'S AND
CHILDREN'S HOSPITAL

APPELLEES

**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING**

These consolidated appeals arise from allegations of medical negligence against a surgical assistant and certain radiologists following Deborah Lloyd's ("Lloyd") total knee replacement surgery, during which a suturing needle was inadvertently left inside her knee after becoming dislodged from its holder during suturing. In this opinion, we revisit the requirement that expert testimony is necessary to establish the standard of care in medical negligence actions. We also address the nuances of our res ipsa loquitur doctrine as it pertains to the concept of exclusive control in cases involving foreign objects retained in a surgical patient's body. Having granted discretionary review, heard oral arguments, and carefully examined the record, we reverse the Court of Appeals and reinstate the trial court's grants of summary judgment in favor of the appellants.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 20, 2019, Dr. Sean Griffin ("Dr. Griffin"), an orthopedic surgeon, with surgical assistant Sheila Slone ("Slone") assisting under Dr. Griffin's direct supervision, performed a total knee replacement surgery on Deborah Lloyd's right knee at Norton Hospitals, Inc. d/b/a Norton's Women's and Children's Hospital ("Norton"). Slone used a suturing needle to close the incision. Shortly prior to full closure of the incision, it became apparent to Slone that a suturing needle had dislodged from its holder and was missing. Slone attempted to locate the needle through a visual search and by

"palpat[ating] the area" but was unsuccessful. Slone immediately reported the loss of the needle, and the entire surgical team, including Slone and Dr. Griffin, searched for the needle. When no needle was found, Dr. Griffin ordered an x-ray of Lloyd's knee to determine whether the needle was inside her knee. Dr. Darren Cain ("Dr. Cain"), a radiologist, reviewed the x-ray. Dr. Cain noted that "[t]here is no unexpected radiopaque foreign body identified." Dr. Griffin also reviewed the x-ray and apparently failed to observe the needle. Dr. Griffin concluded that the needle was likely lost, and he decided against re-opening the incision to continue searching for the needle. Lloyd's surgery was allowed to conclude, and Lloyd was not advised of the possibility that a foreign object had been left inside her after the surgery. As was customary, another x-ray was taken in the recovery room to assess the outcome of the surgery. Dr. Christopher Henley ("Dr. Henley"), a radiologist, reviewed the x-ray but, like Dr. Griffin and Dr. Cain, appears to have failed to observe the needle.

On January 16, 2020, Lloyd attended a post-operative follow-up visit with Dr. Griffin. Dr. Griffin ordered another x-ray of Lloyd's right knee. Dr. Griffin charted in Lloyd's medical record that Lloyd was overall doing well, but that she had a metallic foreign body of unknown origin in her right knee. Dr. Griffin noted that the foreign body was not palpable and did not appear to be affecting her, although he also noted that she appeared to have some delayed healing and blistering. He did not address the foreign object at that time.

3

On February 3, 2020, Lloyd returned to see Dr. Griffin for another follow-up. This time, Dr. Griffin noted that Lloyd's knee had developed "superficial dehiscence" which may have been at least partially caused by the foreign body.

On February 7, 2020, the needle was removed and the wound cleaned during a follow-up procedure. In Lloyd's medical record, Dr. Griffin noted that Lloyd had originally done well after the initial knee replacement,

> but she developed central wound dehiscence that was progressive. Her wound began draining serous fluid. Postoperative x-rays revealed metallic foreign body in the anterior soft tissues of the knee. Wound revision with treatment of the surgical wound dehiscence and removal of the foreign body were indicated in order to prevent further infectious complications, including knee sepsis.

Dr. Griffin also noted that the foreign object appeared to be a suture needle. Dr. Griffin did not prescribe additional antibiotics, "as this did not represent an infection."

Expert disclosures in the record indicate that Lloyd underwent a third surgery on February 28, 2020, to remedy the effects of the retained needle. Additionally, Lloyd had to undergo long term antibiotic use and chronic suppressive therapy, which caused further health complications and harm to Lloyd.

Lloyd filed suit in Jefferson Circuit Court in September 2020, originally naming Slone, Dr. Griffin, Norton, and Ellis and Badenhausen Orthopaedics, P.S.C. as defendants. Lloyd later amended her complaint to add Dr. Henley, Dr. Cain, and Diagnostic X-Ray Physicians, P.S.C. (collectively, "Radiologists") as defendants. Dr. Griffin reached a settlement with Lloyd and has been dismissed as a defendant from this case.

4

Kentucky Rules of Civil Procedure ("CR") 26.02 states that a party may be required to identify

> each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

A scheduling order directed Lloyd to identify her experts and provide disclosures by April 2022. Lloyd identified her expert witnesses as Dr. Morrison, an infectious disease expert, and Dr. Dysart, an orthopedic surgeon. Dr. Morrison's disclosure centered around criticisms of Dr. Griffin and did not specifically criticize the Radiologists or Slone. Because Dr. Griffin is no longer a party to this action, only Dr. Dysart's disclosures are relevant for our purposes.

> As it relates to Dr. Dysart's expected testimony, Lloyd disclosed:

> Dr. Dysart is expected to testify that Defendants' medical care and treatment of Ms. Lloyd was below the standard of good and proper medical care during her care and treatment at Norton Women's and Children's Hospital for her complex right total knee replacement procedure of December 20, 2019. Dr. Sean Griffin failed to locate, remove, and document a suture needle retained by Plaintiff during her surgery due to the actions of the surgical assistant, Sheila Slone. Dr. Griffin failed to properly notify the patient and document the retained suture needle, which had been confirmed by an incorrect instrument count. Retained foreign bodies are known to cause great risk to patients, including but not limited to infection and/or sepsis, possible re-operation, readmissions and prolonged hospital stays, severe pain, and even death.

> He is further expected to testify that [the Radiologists] had a duty to review, identify, and document the intra-operative and post-operative x-rays, showing the retained suture needle, and failed to do so. Failing to locate, identify, and remove the retained suture needle caused a delay in treatment and significant harm to [Lloyd], including but not limited to an infection which required two

5

subsequent surgeries on February 7, 2020 and February 28, 2020, as well as long-term antibiotic use and chronic suppressive therapy which caused further health consequences and harm to [Lloyd].

Dr. Dysart was deposed on August 16, 2022. During this deposition, Dr. Dysart went beyond the scope of his disclosures and written report in criticizing Norton, the Radiologists, and Slone. Dr. Dysart also testified that he could not opine on the standard of care applicable to radiology:

Q: All right. Do you intend on testifying at trial that Dr. [Cain] failed to act as a reasonable radiologist under like or similar circumstances in the services he provided to Ms. Lloyd?

A: I'm not a radiologist.

Q: That's the tenor of my question.

A: So reasonable will have to go to an expert. All I can say is he missed a foreign body. I can say that.

Q: All right. And I understand that. I want you to presume that the question the jury will be given in this case was whether Dr. [Cain] failed to act as a reasonable radiologist under like or similar circumstances. And from what I gather from you, you are not prepared to say that because you are not a radiologist; correct?

A: So I would — I would defer to radiology. Now, from an orthopedic opinion, he missed it.

Q: However, you're not going to testify that Dr. [Cain], or Dr. Henley, for that matter, failed to act as a reasonable radiologist under like or similar circumstances; true?

A: I don't know what reasonable means in terms of the Academy of Radiology. Let them answer that question.

. . . .

Q: All right. And you understand from this case that Dr. [Cain] is a radiologist, as is Dr. Henley; correct?

A: Yes, sir.

6

Q: And they would have completed different residency programs than you; correct?

A: Of course, yes.

Q: All right. And they would, when applying for privileges for the hospital, have applied for different privileges than you; correct?

A: Sure

Q: All right.

A: Yeah, sure.

Q: And they would be board-certified by a different specialty board than you; correct?

A: Are they board-certified?

Q: Yes.

A: I didn't – okay. Yes, sir.

Q: Okay. And would belong to different professional societies than you; correct?

A: Yes, sir.

Q: All right. And you do not hold yourself out as a radiologist and never have and never will; correct?

A: No, sir.

Q: That is correct?

A: That's correct.

Q: All right. And you do not consider yourself to be an expert in the field of radiology; correct?

A: Okay. So in my experience dealing with multiple radiologists, we can often read a film better than they can about a specific issue; and the reason is we see many, many more of the same thing. So in my practice, we often didn't have radiology review films because we considered ourselves adequate and well-enough trained to read them ourselves, which is what we do routinely. So there are certain

7

situations that we actually are more appropriate reviewing the film than they are. I will tell you that.

Q: All right. Do you consider yourself to be a radiology expert?

A: Oh, no, sir.

Q: All right. Do you consider yourself to know what the standard of care is in the field of radiology?

A: No sir.

Additionally, Dr. Dysart's deposition criticized the actions of a circulating nurse employed by Norton[1], even though such opinions were outside the scope of his disclosure. Claiming that the deposition testimony included unexpected testimony leading to unfair surprise, Norton moved to strike all testimony in Dr. Dysart's deposition transcript between pages 169 and 235 where he was critical of the nurse. The trial court granted this motion, ordering that "the late-disclosed opinions of Dr. Stanley Dysart contained in Dr. Dysart's deposition" be stricken from the record. Lloyd was unsuccessful in challenging the trial court's order striking the deposition testimony, which Lloyd claimed was overbroad and struck non-surprise testimony pertaining to Dr. Dysart's criticisms of the Radiologists. Despite Lloyd's extensive discussion of the stricken portions of Dr. Dysart's testimony, she neither filed a cross-motion nor asked for any relief from the trial court's order.

---

[1] In addition to her claims against Slone, the Radiologists, and Dr. Griffin, Lloyd also asserted claims against Norton based on the alleged actions of its employee, a circulating nurse. Aside from this brief mention, those claims are not pertinent to this appeal.

On November 15, 2022, Slone filed a motion for summary judgment, arguing that

> the deadline for disclosing experts has expired and Lloyd has not identified any expert who will testify that Slone breached the standard of care applicable to surgical assistants. In fact, the only evidence on the record on that issue came from Dr. Griffin, who testified that Slone did not deviate from the standard of care applicable to surgical assistants in Kentucky.
>
> Under Kentucky law, a plaintiff is required to submit expert testimony on the issue of professional negligence, meaning Lloyd must submit expert testimony from which a jury could reasonably conclude that Slone deviated from the applicable standard of care. There is no such expert, therefore Slone is entitled to summary judgment in her favor.

Lloyd responded by acknowledging that "[i]t is accurate that both of Plaintiff's retained expert witnesses have given deposition testimony indicating that, in regards to the factual events indicated in the medical records and deposition testimony, they had no specific criticism of [Slone] regarding a breach of the applicable standard of care," but argued that such was not needed because the case against Slone is one of res ipsa loquitur.[2]

---

[2] According to Black's Law Dictionary, res ipsa loquitur is Latin for the phrase, "the thing speaks for itself." RES IPSA LOQUITUR, Black's Law Dictionary (12th ed. 2024). Res ipsa loquitur is defined as,

> The doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence that establishes a prima facie case; specif., the doctrine whereby when something that has caused injury or damage is shown to be under the management of the party charged with negligence, and the accident is such that in the ordinary course of things it would not happen if those who have the management use proper care, the very occurrence of the accident affords reasonable evidence, in the absence of the explanation by the parties charged, that it arose from the want of proper care.

*Id.*

On December 5, 2022, the Radiologists also filed a motion for summary judgment, premising their motion on the fact that neither of Plaintiff's experts claimed that the Radiologists failed to act as a reasonable radiologist in the same or similar circumstances and that no expert testimony was presented addressing the applicable standard of care for a radiologist.

In a consolidated opinion and order, the trial court addressed both motions for summary judgment. The trial court granted summary judgment in favor of Slone, finding that res ipsa loquitur did not apply:

> In the case *sub judice* and from the facts as they exist in the record, the only defendant who had control of the instrumentality [the suture needle] causing Plaintiff's injury was the certified surgical assistant, Slone. Thus, while the doctrine of *res ipsa loquitur* could be invoked to create a rebuttable presumption of negligence on her part, that presumption has been rebutted by the facts in the record. Plaintiff stipulates that "[n]o witness has testified as to a specific act or lack thereof on the part of Ms. Slone that was contrary to the protocol in question," and "[i]t is accurate that both of Plaintiff's retained expert witnesses have given deposition testimony indicating that, in regards to the factual events indicated in the medical records and deposition testimony, they had no specific criticism of [Slone] regarding a breach of the applicable standard of care." Indeed, there was testimony by Plaintiff's expert, Dr. Dysart, that the suture needle could have become detached without any negligence on the part of Slone. While the Plaintiff opines that further discovery could unearth facts which could enable a jury to find Slone negligent, again, in reviewing a motion for summary judgment under CR 56.03, "the focus should be on what is of record rather than what might be presented at trial." *Welch* [*v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724, 730 (Ky. 1999)].

(emphasis removed). Notably, the trial court elaborated that because "the doctrine of *res ipsa loquitur* is applicable only to those who had full control of the instrumentality which caused the injury, and only Slone had such control, the doctrine is inapplicable to Norton and the [Radiologists]." (internal

10

quotation marks omitted). The trial court also granted summary judgment in favor of the Radiologists, finding that "neither expert has held themselves out as experts in the field of radiology, and the Court agrees that the standard of care and any breach thereof by radiologists is not within the common knowledge or experience of any layman." Lloyd filed a motion to reconsider the trial court's order granting summary judgment to Slone and the Radiologists, which the trial court denied.

The Court of Appeals reversed the trial court's grant of summary judgment to both Slone and the Radiologists. As it pertains to the Radiologists, the Court of Appeals based its reasoning on the qualifications of expert witnesses:

> The Radiologists assert that plaintiffs in a medical malpractice case are required to present expert testimony establishing the standard of care expected of the "class of physicians or specialists to which he belongs." However, our caselaw indicates that once the trial court determines the expert is properly qualified, the jury is responsible for weighing the expert's testimony. *See Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992) (citations omitted) (stating factors like qualifications, experience, and training go to the weight of the testimony, not admissibility). . . . Likewise, this Court has recognized that "[t]here are numerous reported cases where a physician has been held qualified to express an opinion on medical matters outside his area of expertise."
>
> . . . .
>
> [T]he trial court . . . abuse[d] its discretion in determining that there was insufficient evidence in Dr. Dysart's . . . testimony to submit to a jury on Lloyd's claims that the Radiologists failed to diagnose or locate the suture needle. As discussed, testimony from a medical provider who specializes in a different area of medicine or who is licensed or practices in a different medical discipline may not carry as much weight with a jury.

11

> Here, the trial court based its summary judgment in favor of the Radiologists on a determination that it would be impossible for Lloyd to proceed to trial without an expert qualified in the field of radiology. However, Dr. Dysart was qualified to testify regarding the Radiologists; therefore, there was a genuine issue of material fact for the jury to review.

(some internal citations omitted).

As it pertains to Slone, the Court of Appeals held that expert testimony was not required based on the doctrine of res ipsa loquitur. The Court of Appeals explained that "typically, 'the plaintiff in a medical negligence case is required to present expert testimony' establishing both 'the standard of skill expected of a reasonably competent . . . practitioner' and the proximate cause of the injury." (quoting *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006)).

> But there are two important exceptions, one involving a situation where any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care; illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy. The second occurs when medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters.

*Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992) (internal quotation marks and citations omitted). The Court of Appeals found that both exceptions were applicable here to prevent summary judgment in favor of Slone.

Both Slone and the Radiologists appealed the Court of Appeals' reversal of summary judgment, and their appeals were consolidated. Further facts will be developed below as necessary.

## ANALYSIS

The Radiologists ask us to answer whether Dr. Dysart's expert testimony is sufficient to satisfy the requirement that, in a medical negligence case, a plaintiff must bring forth expert testimony as to "the applicable medical standard of care, any breach of that standard, and the resulting injury." *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010) (citing *Perkins*, 828 S.W.2d at 655). Slone asks us to decide whether res ipsa loquitur eliminates the need for expert testimony in a retained-foreign-object case where the evidence shows that the person who controlled the object until it was lost inside the patient was not negligent in losing it, and that a different individual exclusively controlled the subsequent decision to continue or abandon efforts to locate and retrieve it.

As Slone and the Radiologists raise distinct issues, their claims of error will be addressed separately.

**Standard of Review**

Both the Radiologists and Slone appeal the Court of Appeals' reversal of summary judgment. Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 483 (Ky. 1991) (quoting *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)). Furthermore, CR 56.03 states that summary judgment should be granted if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

13

matter of law. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest*, 807 S.W.2d at 480.

"Because summary judgments involve no fact finding, this Court will review the circuit court's decision de novo." *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 445 (Ky. 2005). On appeal, "[t]he standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law. Summary judgment is appropriate where the movant shows that the adverse party could not prevail under any circumstances." *Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky. 2002).

To the extent that the Radiologist's appeal concerns the trial court's ruling on the admissibility of Dr. Dysart's testimony, this was an evidentiary determination by the trial court and is reviewed for an abuse of discretion. "A trial court's ruling on the admission of expert testimony is reviewed under the same standard as a trial court's ruling on any other evidentiary matter." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky. 2000). "Generally, we review a trial court's evidentiary determinations for abuse of discretion—'whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018) (quoting *Lopez v. Commonwealth*, 459 S.W.3d 867, 872–73 (Ky. 2015)).

14

**Radiologists**

Lloyd's case against the Radiologists hinges on whether she can proceed with only Dr. Dysart's expert testimony in her medical negligence case against the Radiologists.[3] "As explained previously, a plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony to inform the jury of the applicable medical standard of care, any breach of that standard and the resulting injury." *Blankenship*, 302 S.W.3d at 675 (citing *Perkins*, 828 S.W.2d at 655). No party disputes that, while Dr. Dysart's testimony does critique the Radiologists and allege that they have fallen short of their standard of care, his testimony does not name what that standard of care for radiologists is. On the contrary, Dr. Dysart admitted under oath that he does not know the standard of care for radiologists.

The Court of Appeals held that Dr. Dysart was *qualified* to testify despite specializing in a different area of medicine, and that after passing the initial threshold for qualifying as an expert, the question of credibility was left to the jury. The Court of Appeals explained that, while Dr. Dysart is an orthopedic surgeon and not a radiologist, "[t]here are numerous reported cases where a physician has been held qualified to express an opinion on medical matters outside of his area of expertise." (quoting *Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 677–78 (Ky. App. 1999)). The Court of Appeals

---

[3] Per CR 26.02 and the trial court's scheduling order which set a deadline for expert disclosures which has now passed, Dr. Dysart's testimony will be limited in scope to that which was disclosed in Lloyd's expert disclosure.

explained that "testimony from a medical provider who specializes in a different area of medicine or who is licensed or practices in a different medical discipline may not carry as much weight with a jury." (citing *Payne*, 24 S.W.3d at 677–78). Nevertheless, the Court of Appeals concluded that,

> the trial court based its summary judgment in favor of the Radiologists on a determination that it would be impossible for Lloyd to proceed to trial without an expert qualified in the field of radiology. However, Dr. Dysart was qualified to testify regarding the Radiologists; therefore, there was a genuine issue of material fact for the jury to review. *See Goodman*, 830 S.W.2d at 400. Thus, as to the Radiologists, we reverse the summary judgment in their favor.

None of this is untrue — it just misapprehends the actual issue at hand.

The Court of Appeals incorrectly framed the issue as "whether it would be impossible for Lloyd to proceed against the Radiologists without expert testimony from a physician in the same specialty." Whether Dr. Dysart meets the baseline qualification to testify against Radiologists is not the present controversy. Indeed, as the Court of Appeals points out, "[a] physician or other medical provider is not automatically disqualified from testifying against a defendant who specializes in a different area of medicine or who is licensed or practices in a different medical discipline." *Tapp v. Owensboro Med. Health Sys., Inc.*, 282 S.W.3d 336, 341 (Ky. App. 2009). Dr. Dysart could testify, and his "special knowledge skill, experience, training, or education" would likely "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Kentucky Rule of Evidence ("KRE") 702.

However, even if this case goes to trial and Dr. Dysart testifies, one vital piece will still be lacking – Lloyd still has no expert to testify as to the standard

16

of care for the Radiologists. Dr. Dysart can assist with testifying as to varying aspects of a radiologists' duties and how he has typically seen them performed, but one thing he has specifically said he cannot do is recite the standard of care for radiologists. The time afforded to Lloyd to identify her experts has passed, and unfortunately for her, the aggregate of her two experts still leaves her coming up short as to the standard of care for radiologists. Expert testimony as to the applicable standard of care is a requirement in medical negligence cases:

> [A] plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony to inform the jury of the **applicable medical standard of care**, any breach of that standard and the resulting injury. *Perkins*[], 828 S.W.2d at 655. A jury trial without the requisite proof is a futile exercise, wasteful of judicial time, jurors' time and the litigants' time and resources. CR 56 is intended to avoid such unnecessary proceedings. *Neal v. Welker*, 426 S.W.2d 476, 479-80 (Ky. 1968) "the curtain must fall at some time upon the right of a litigant" to put forth the most basic level of proof and the plaintiff's bare assertion "that something will turn up' cannot be made basis for showing that a genuine issue as to a material fact exists"; *Green v. Owensboro Medical Health System, Inc.*, 231 S.W.3d 781, 784 (Ky. App. 2007) (the trial court properly granted summary judgment for the defendant doctor because the plaintiff, by not identifying any expert witnesses, "failed to introduce evidence sufficient to establish the respective applicable standard of care").

*Blankenship*, 302 S.W.3d at 675 (emphasis added).

While Lloyd contends that Dr. Dysart "has performed hundreds of knee replacements and knows the standard of care for the procedure and role of the radiologist," this is in direct contradiction to Dr. Dysart's own admissions that he does not know the standard of care for radiologists. In his deposition, he was directly asked, "[d]o you consider yourself to know what the standard of

17

care is in the field of radiology?" to which Dr. Dysart clearly and plainly responded, "[n]o sir." While Dr. Dysart might assist the jury in other aspects of the case, he, by his own admission, is unable to assist the jury with determining the standard of care for radiologists, an essential element for a medical negligence case.

Lloyd contends that Dr. Dysart "admitted during his deposition that he is not a radiologist [he is an orthopedic surgeon] but he has knowledge of the role of the Radiologist and what is expected of one doing the imaging for this operation which he has done hundreds of times." Lloyd also cites Dr. Dysart for his assertion that the Radiologists' oversight was a "stunning miss" as evidence that the standard of care was breached, even though Dr. Dysart declined, in the first place, to define the standard of care.

Different medical specialties have different standards of care, and one will only be held to the standard of care in the specialty in which they are trained. "In the arena of medical negligence, controlling Kentucky authority imposes upon a physician the duty to 'use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs acting in the same or similar circumstances.'" *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991) (quoting *Blair v. Eblen, Ky.*, 461 S.W.2d 370, 373 (Ky. 1970)). While Lloyd implicitly argues that Dr. Dysart's assertion that the Radiologists made a "stunning miss" is sufficient to imply that the standard of care was breached, it is impossible to know that a standard was not met without first defining the standard. We are unwilling to extend the

18

requirement that an expert specify the relevant standard of care to include testimony that does not define the standard of care but instead invites the finder of fact to construct the standard of care through a series of inferences.

We are also unwilling to substitute the requirement that a medical negligence plaintiff present proof *of* the standard of care with the requirement that the plaintiff present proof of *breach* of the standard of care. Our jurisprudence in this area has always treated the two as distinct requirements, both of which the plaintiff must prove through expert testimony. *See Blankenship,* 302 S.W.3d at 667 ("Pursuant to Kentucky law, in most medical malpractice cases, a plaintiff is required to put forth expert medical testimony to establish the **applicable standard of care**, any **breach** that occurred and any resulting injury to the plaintiff." (emphasis added)); *Savage v. Three Rivers Med. Ctr.,* 390 S.W.3d 104 (Ky. 2012) ("Upon examination of the testimony, it is apparent that it does not identify with specificity the relevant **standard of care** applicable to a surgeon in a retained object case, nor does it examine [medical defendant]'s specific conduct during the surgery so as to demonstrate how he **breached** the relevant standard of care. . . . Because [Plaintiff] failed to meet its burden of establishing by expert testimony the **standard of care** imposed upon [medical defendant] in a surgery such as this, and that he **breached** that standard of care by his specific actions or failure to act, the trial court properly denied [plaintiff]'s request for an apportionment instruction." (emphasis added)); *Baptist Healthcare Sys., Inc. v. Miller,* 177 S.W.3d 676, 680–81 (Ky. 2005) ("As the standard of care is not within the scope of common experience of

19

jurors, requiring expert testimony as to the standard of care of a phlebotomist was a proper exercise of trial court discretion."); *Lloyd v. Norton Hosps., Inc.*, No. 2023-CA-0748-MR, 2024 WL 1685440 (Ky. App. Apr. 19, 2024), *review granted* (Oct. 16, 2024), *not to be published* ("typically, 'the plaintiff in a medical negligence case is required to present expert testimony' establishing both 'the standard of skill expected of a reasonably competent . . . practitioner' and the proximate cause of the injury") (quoting *Andrew*, 203 S.W.3d at 170).

Further, what may be a "stunning miss" to one specialty is not necessarily to another specialty. Dr. Dysart testified that in the context of orthopedic radiology, he thinks he is more qualified to render an opinion in this case than a radiologist. If we accept this as true, what might be a "stunning miss" to him still might not fall below the standard of care for radiologists in general. Dr. Dysart testified that he is unable to testify as to what the American College of Radiology standards are. Without a specific standard of care, the rest is pure speculation. We can only hold a professional to the standards relevant to their level of training and credentialing. To analogize simply, we cannot hold a paramedic to the same standards as we hold a cardiologist, although both are trained to recognize and respond to cardiac emergencies. The same is true here — although both radiologists and orthopedic surgeons share some competencies, each specialty undergoes a distinct level of education and training. It would be unfair to hold one specialty to the standards of another when one receives vastly greater or different training.

20

"In a medical malpractice action, where a sufficient amount of time has expired and the plaintiff has still 'failed to introduce evidence sufficient to establish the respective applicable standard of care,' then the defendants are entitled to summary judgment as a matter of law." *Blankenship*, 302 S.W.3d at 668. While the Court of Appeals focused on answering whether Dr. Dysart was *qualified* to opine as an expert witness, this was a distinct issue from whether Lloyd presented expert testimony regarding the relevant standard of care of the Radiologists. Perhaps Dr. Dysart was *qualified* to testify about the standard of care of the Radiologists — he just *did not*. Because of this glaring omission, summary judgment was appropriate, and we reverse the Court of Appeals' reversal of the trial court's grant of summary judgment in favor of the Radiologists.

**Slone**

As discussed above, expert testimony is typically required to prove medical negligence. However, expert testimony may not be required when negligence can be presumed, such as through the doctrine of res ipsa loquitur.

> As applied to this case [*res ipsa loquitur*] means nothing more than whether the facts and circumstances are such that negligence can be inferred, even in the absence of expert testimony. As Prosser explains, *res ipsa loquitur* is a "Latin phrase, which means nothing more than the thing speaks for itself," and is simply "[o]ne type of circumstantial evidence." *Prosser and Keeton on Torts,* Sec. 39 (5th ed. 1984).

*Perkins*, 828 S.W.2d at 654–55.

The primary question in Slone's appeal is whether res ipsa loquitur applies in a retained-foreign-object medical negligence case where the

21

defendant had exclusive control over the instrument immediately before it became lost inside the patient, but the evidence shows that the loss occurred without any negligence by the defendant and that the defendant had no actual or constructive control of the instrument after it became lost. As discussed above, the trial court found that res ipsa loquitur "could be invoked to create a rebuttable presumption of negligence on [Slone's] part" but "that presumption has been rebutted by the facts in the record" — i.e., the evidence that Slone was not negligent in her actions when the needle became separated from the holder and became lost inside Lloyd. Consequently, the trial court granted summary judgment in favor of Slone based upon Lloyd's lack of expert witness testimony proving that Slone was negligent.

The Court of Appeals reversed the trial court's grant of summary judgment in favor of Slone. The Court of Appeals held that, while normally most medical malpractice claims cannot be proven without expert testimony establishing a breach of the applicable standard of care resulting in the plaintiff's injuries, the case at hand met both exceptions to this rule.

> Speaking to how the [*res ipsa* loquitur] doctrine applies to the "question of duty ... in cases of medical malpractice," Prosser advises that "ordinarily" negligence cannot be inferred simply from an "undesirable result"; expert testimony is needed. [*Prosser and Keeton on Torts,* § 39, at 256 (5th ed. 1984)]. But there are two important exceptions, one involving a situation where "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care"; . . . The second occurs when "medical experts may provide a sufficient foundation for res ipsa loquitur on more complex matters." *Id.* at 257.

*Perkins*, 828 S.W.2d at 654–55.

22

> *Res ipsa loquitur* applies in medical malpractice cases when "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care" or "when 'medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters.' " *Hausladen*, 828 S.W.2d at 655 (quoting [*Rose*, 683 S.W.2d at 256-57]). The former is "illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy." *Id.* at 654. The latter occurs when expert testimony establishes the "type of injury was not an ordinary risk of the surgery, that the method by which it occurred was within the exclusive control of the defendant, and that the injury was not due to any voluntary action or contribution on the part of the plaintiff." *Id.* at 655. In other words, "when the circumstances and the probabilities as to the *causative factors of an accident* lie within the ken of experts, expert evidence is necessary to establish a foundation that gives rise to an inference of negligence." 65A C.J.S. *Negligence* § 820 (emphasis added).

*St. Elizabeth Med. Ctr., Inc. v. Arnsperger*, 686 S.W.3d 132, 138–39 (Ky. 2024).

The Court of Appeals held that this case both involved a situation where "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care" and was a situation that "medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters."[4]  *Id.*  Thus, the Court of Appeals held that Lloyd need not present expert testimony to prove her case against Slone and reversed the trial court's grant of summary judgment in Slone's favor.

The res ipsa loquitur doctrine can be invoked "when a thing which causes injury, without fault of the injured person, is shown to be under the

---

[4] Curiously, the Court of Appeals holds this second exception applies without explanation.

23

exclusive control of the defendant, and the injury is such as, in the ordinary course of things, **does not occur if the one having such control uses proper care**, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." *Schechter v. Hann*, 205 S.W.2d 690, 692 (Ky. 1947) (emphasis added). "When the facts bring a case within the doctrine, a presumption of negligence arises and the burden of proof is on the defendant to rebut the presumption." *Id.* Under the doctrine of res ipsa loquitur, "[t]here may be an inference of negligence when, according to common knowledge and experience, *the accident would not have happened except for* the **wrongful act** of the defendant.'" *Arnsperger*, 686 S.W.3d at 139 (quoting *Jos. N. Rice Co. v. Grayson*, 341 S.W.2d 238, 239 (Ky. 1960)) (bolded emphasis added).

Here, in the simplest terms, res ipsa loquitur does not apply against Slone because expert testimony establishes that she was not negligent in her actions when the needle broke free from its holder, and she was not in control of the needle after it left the holder. Dr. Dysart admitted that a suture needle becoming detached from the holder can happen even if a person is being careful, and that he "would not conclude . . . at all" that Slone had not been careful by the fact that the needle became detached from its holder. He noted that, "It's happened to me; going to happen to her. It'll happen to her again." In fact, when asked if he had any criticisms of the care Slone provided, Dr. Dysart answered, "[s]he's fine."

Further, this is a case of a *retained* foreign object, not a case where the initial dropping of the needle caused Lloyd harm. Had the needle been immediately retrieved, Lloyd would have suffered no harm. It was only the retention of the needle which caused Lloyd harm. "Applying *res ipsa loquitur* to a specific defendant in a specific case requires a showing that the defendant had full control of the instrumentality which caused the injury." *Savage*, 390 S.W.3d at 113. Slone had no control over whether the needle stayed in the patient's body or whether more efforts were undertaken to search for the needle after it went missing.

> [A]ny number of people including the surgeon, anesthesiologist, nursing staff, and other hospital staff may be at fault for having left an offending item in a plaintiff's body. The varied business relationships which exist at modern hospitals further complicate the issue. Because of these various types of relationships, no two surgical procedures are exactly alike, and the duties and respons-ibilities of the medical care professionals will likely depend on the specific facts of each case.

*Nazar v. Branham*, 291 S.W.3d 599, 604 (Ky. 2009). Surgical assistants in Kentucky have a limited scope of permitted activities. KRS 311.864(6) defines the role of a surgical assistant: "'Surgical assisting' means providing aid under direct supervision in exposure, hemostasis, closures, and other intraoperative technical functions that assist a physician in performing a safe operation with optimal results for the patient." "Direct supervision" is statutorily defined as "supervision by a delegating physician who is physically present and who personally directs delegated acts and remains immediately available to personally respond to any emergency until the patient is released from the

25

operating room or care and has been transferred to the care and responsibility of another physician[.]" KRS 311.864(4).

Slone did everything within her power to find the needle after it had been lost — she notified Dr. Griffin and the rest of the surgical team and conducted a visual search for the needle. Beyond that, the responsibility was on Dr. Griffin to determine next steps. Slone had no authority to order or read an x-ray; she could not order the patient's wound to be reopened and manually searched for the needle; and she had no authority over the patient's treatment plan after the surgery was completed. In short, while she had physical control of the needle during the suturing process, after she lost physical custody of the needle, the needle became under the constructive control of Dr. Griffin. *See Ashland Coca-Cola Bottling Co. v. Byrne*, 258 S.W.2d 475, 476 (Ky. 1953) ("It must be remembered that the doctrine of *res ipsa loquitur* is based on the principle that in the ordinary course of things an injury would not have occurred in the absence of negligence of the person having **management or control** of the agency which caused the injury." (emphasis added)).

While the Court of Appeals held that this case fell squarely into both res ipsa loquitur exceptions to the requirement of expert testimony,

> one involving a situation where "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care" [and t]he second occurs when "medical experts may provide a sufficient foundation for res ipsa loquitur on more complex matters[,]"

we are not so convinced. *Perkins*, 828 S.W.2d at 654–55. For the first exception, a layman would not know whether or when a needle becoming

26

unhoused from its holder during suturing would be the result of a lack of due care by the suturer. A layman would likely understand, however, that ordering and reading x-rays or re-opening a sutured incision to conduct a manual search for a lost needle would be outside the authority of a surgical assistant. Further, we acknowledge that in *Perkins*, this Court explained that the first exception is "illustrated by cases where the *surgeon leaves* a foreign object in the body or removes or injures an inappropriate part of the anatomy." 828 S.W.2d at 655 (emphasis added). However, this is a distinct situation from the one at hand in which a surgical assistant lost the needle, but a surgeon made the decisions which caused the patient to retain the needle.

As for the second exception, the Court of Appeals concludes that the exception applies but gives no reasoning to support its conclusion. However, we hold that this exception does not fit the facts of this case. *Arnsperger* explains that this exception applies when "expert testimony establishes the 'type of injury was not an ordinary risk of the surgery, that the method by which it occurred was within the exclusive control of the defendant, and that the injury was not due to any voluntary action or contribution on the part of the plaintiff.'" 686 S.W.3d at 138 (quoting *Rose*, 683 S.W.2d at 256–57). As we have explained, Slone was not in control of the instrument during the timeframe relevant to the alleged harm — its *retention* in Lloyd.

While it is true that many retained foreign object cases are the classic textbook case of res ipsa loquitor, these cases seem to contemplate situations where the individual with control over the instrument is either negligent in

27

losing the instrument or is the same individual with control over retrieving the instrument once lost. Typically, this is the surgeon. *See Nazar*, 291 S.W.3d at 604 ("juries are free to analyze the reliability and veracity of the defendant's expert witnesses and weigh it against the likelihood that the **surgeon was negligent in failing to remove an object** from the plaintiff's body during surgery" (emphasis added)); *id.* ("While the **retained foreign object** is evidence of negligence, the jury is free to determine the ultimate issue of the **surgeon's liability** from the evidence presented at trial."); *Arnsperger*, 686 S.W.3d at 138 ("any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care . . . where the **surgeon leaves** a foreign object in the body or removes or injures an inappropriate part of the anatomy.").

The dissent asserts that summary judgment was inappropriate and that a jury should get to decide whether Slone breached her duty to Lloyd. Summary judgment should be granted if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56.03. Despite Lloyd's stipulation that no expert has criticized Slone's actions or claimed that she breached her standard of care, the dissent cites part of Dr. Dysart's stricken testimony for the proposition that "Slone could have removed stitches to look for the needle." However, Dr. Dysart also acknowledged that he is unaware of whether a surgical assistant is authorized in Kentucky to reopen a wound, and that he does not criticize Slone for not reopening the wound to search for the needle.

28

In fact, Dr. Dysart expressed that unless a surgical assistant is authorized to do so, opening a wound to search for a lost needle would "be a problem." The dissent further offers that Slone "still could have been negligent in her efforts to find the needle or in describing to the surgeon the thoroughness of her efforts to locate the needle and confidence in concluding that it was not retained in Lloyd." Simply put, there is no evidence in the record to support these hypotheticals, and therefore, summary judgment was wholly appropriate.

While Slone was the last to have physical control over the needle, and Lloyd's injuries would not have occurred but for the needle becoming dislodged during the time that Slone maintained control, this fact cuts only towards causation, not breach of a duty. Proving causation is merely a prerequisite for the application of res ipsa loquitur — it does nothing to prove that a duty was breached. *Arnsperger*, 686 S.W.3d at 139 (stating that res ipsa loquitur "allows an inference of negligence in certain cases, not causation; established causation is a prerequisite to the application of the doctrine.").

Certainly, "*res ipsa loquitur* allows the jury to infer negligence solely from the fact that a surgical item was left in the patient's body." *Savage*, 390 S.W.3d at 113. But the inference afforded by res ipsa loquitur that *someone* was negligent does not necessarily mean that *Slone* was negligent. Our jurisprudence has long recognized that

> where the thing is shewn to be **under the management of the defendant or his servants**, and the accident is such as in the ordinary course of things **does not happen if those who have the management use proper care**, it affords reasonable evidence, in

29

> the absence of explanation by the defendants, that the accident arose from want of care.

*Lewis v. Wolk,* 228 S.W.2d 432, 433 (Ky. 1950) (emphasis added) (quoting *Scott v. The London & St. Katherine Docks Co.,* 159 Eng. Rep. 665 (Ex. 1865)). The evidence in this case demonstrates that Slone used proper care in performing her duties. Nevertheless, a needle broke off, and Dr. Griffin made the choice to cease efforts to locate the needle after misreading an x-ray. The evidence in this case points to the negligence of Dr. Griffin, but it does not indicate negligence by Slone. Any regret Lloyd may have about settling with Dr. Griffin does not justify asserting negligence claims against those for whom the record shows no fault. To allow an inference of negligence to be made where all facts indicate the opposite would be an abuse of legal doctrine and contrary to the original intent of res ipsa loquitur.

In sum, because the record contains no allegations that Slone was negligent in causing the needle to become separated from its holder, and because Slone did not maintain control over the decisions that caused the needle to be retained in Lloyd's knee, res ipsa loquitur does not apply to Lloyd's claims against Slone. Therefore, Lloyd was required to provide expert testimony detailing the applicable medical standard of care, any breach of that standard, and the resulting injury. Because the record is void of such expert testimony, and the time for identifying experts and making the required disclosures has passed, summary judgment in favor of Slone was appropriate. Because the Court of Appeals reversed the trial court's grant of summary judgment to Slone, we reverse the Court of Appeals.

30

## CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals, which reversed the trial court's grants of summary judgment to the Radiologists and Slone. We now reinstate the trial court's grants of summary judgment.

Lambert, C.J.; Bisig, Conley, Keller, Nickell and Thompson, JJ., sitting. Lambert, C.J.; Bisig, Conley, and Nickell, JJ., concur. Thompson, J., dissents by separate opinion. Goodwine, J., not sitting.

THOMPSON, J., DISSENTING: Respectfully, I dissent. Under the doctrine of *res ipsa loquitur*, there is a presumption of negligence that shifts the burden of proof to all members of the surgical team to prove that they do not share responsibility for the retained object. This presumption is sufficient to raise material factual issues as to the negligence of the surgical team and, accordingly, summary judgment was improperly granted to radiologist Dr. Darren Cain, his employer Diagnostic X-Ray Physicians, and surgical assistant Sheila Slone. The majority opinion errs in upholding their dismissal as defendants. The issue as to who is ultimately responsible for Deborah Lloyd's injury and damages and their comparative negligence must be resolved by a jury.

31

Lloyd entered the hospital[5] for what should have been a routine knee replacement surgery. After the surgery, a needle over one-half of an inch in length[6] remained in her body.

During surgery, while Slone was suturing Lloyd's subcutaneous tissue, Slone noticed that the needle was missing from its holder. She searched the surgical opening for the needle, searched the operating room, and told surgeon Dr. Sean Griffin about the missing needle. Dr. Griffin ordered one x-ray to look for the needle. Radiologist Dr. Cain read that x-ray. Neither Dr. Griffin nor Dr. Cain observed the needle on that x-ray. Dr. Griffin determined that Slone should continue suturing Lloyd and conclude the surgery. He did not inform Lloyd that a needle was possibly retained in her body. The needle was not observed on subsequent x-rays that Dr. Christopher Dale Henley read later that day when assessing the success of the knee replacement procedure.

Lloyd experienced problems in healing after the surgery. Dr. Griffin ordered x-rays a month after the surgery. The needle was identified on those x-rays and Lloyd had further surgery to remove the needle.

Lloyd filed a tort action against Dr. Griffin, Slone, and the hospital, and later added the radiologist defendants. Dr. Griffin subsequently settled with Lloyd, resolving his liability.

---

[5] Norton Hospitals, Inc. d/b/a Norton Women's and Children's Hospital.

[6] This suturing needle was one- and one-half centimeters in length; 1.5 centimeters is approximately .59 inches or 19/32 of an inch.

The entire surgical team had a sacred duty to protect Lloyd from injury while she was unconscious and lacked all control over her body. The surgical team included Dr. Griffin, Slone, and the circulating nurse employed by the hospital. Dr. Cain was made part of the surgical team when he was tasked with finding the needle left in her body. I reject the notion that liability devolves solely to the surgeon as "captain of the ship" as courts have moved away from this interpretation in recognition of the fact that surgery is a team effort with various people having roles to play in its successful conclusion.

The majority opinion states that summary judgment was properly granted to the radiologists because Lloyd does not have an expert who could testify to the radiological standard of care.

As to Dr. Cain, Lloyd alleged he was a member of the surgical team. The majority invades the province of the jury by making a finding of fact that he was not in control of the surgery and therefore is not liable. When a radiologist is requested to read an x-ray for the purpose of finding a misplaced needle within a surgical wound before the patient is fully sewn up and taken out of surgery, there is, at a minimum, a question of fact as to whether the radiologist then becomes a member of the surgical team with constructive control over the object he was asked to find. The fact that the conclusion of the surgery was delayed for this radiologist to evaluate whether the needle was retained in Lloyd may make him a vital member of the surgical team from that point forward.

When Dr. Cain failed to observe the needle, and that needle was later located by x-ray a month later, it is obvious that he failed in his duty to protect

33

the patient. Under these circumstances, there is a presumption of negligence under the doctrine of *res ipsa loquitur* that shifts the burden to the radiologist to disprove his comparative fault.

A jury of ordinary people can understand that a surgical implement should not be left in a patient's body after surgery. It is within the jury's common knowledge that a radiologist, a doctor who is trained at interpreting x-rays and in obtaining optimal views to observe the inside of a person's body, should be able to observe the presence of a metal foreign object retained in the patient on an x-ray. Therefore, ordinary people can understand that if a radiologist fails to spot a needle left in a patient's body (either through incorrectly reading an x-ray or through not obtaining the correct images, through additional x-rays or otherwise), and that needle is later located by x-ray images, there is substantial evidence that the radiologist failed to appropriately perform his job.

Similarly, a jury of ordinary people can understand that where a surgical assistant loses a needle in a patient and then fails to find it, resulting in the needle remaining in the patient, there is substantial evidence that she failed to perform her job appropriately.

Summary judgment is precluded where there are issues of material fact that are not conclusively refuted by the record. I reject the notion that it is conclusive at this stage in the proceedings that the surgeon alone had control of the needle after it was lost and, thus, no one else's conduct qualifies for the *res ipsa loquitur* presumption of negligence. As to Slone, the majority opinion

turns the doctrine of *res ipsa loquitur* on its head by concluding that she is entirely precluded from any liability because she refuted the presumption of negligence.[7] The majority reaches this conclusion on the basis that no one testified that Slone was negligent in losing the needle and the actual harm to Lloyd resulted from the retention of the needle and not the losing of the needle, a matter which was the sole responsibility of the surgeon. Respectfully, *res ipsa loquitur* does not require *any* further proof of negligence to survive summary judgment when a foreign object is left in a patient after surgery. The needle could not be retained without first being lost, and even if Slone was not negligent in losing the needle, she still could have been negligent in her efforts to find the needle or in describing to the surgeon the thoroughness of her efforts to locate the needle and confidence in concluding that it was not retained in Lloyd.

Dr. Cain and Slone may well be able to produce evidence at trial to refute the presumption that they were negligent, but at the summary judgment stage Lloyd was not required to do more to establish their negligence under the circumstances where some or all of the surgical team was responsible for the loss of the needle.

---

[7] The majority opinion relies on Lloyd's expert stating that Lloyd was not negligent in dropping the needle, while also affirming striking of testimony by that same expert which concluded that Slone could be negligent for failing to undo stitches to look for the needle and failing to follow hospital policy on retained objects.

## I. THE BASICS OF *RES IPSA LOQUITUR* AS APPLIED TO RETAINED FOREIGN OBJECTS DURING SURGERY

"*[R]es ipsa loquitur* allows the jury to infer negligence *solely* from the fact that a surgical item was left in the patient's body." *Savage v. Three Rivers Medical Center*, 390 S.W.3d 104, 113 (Ky. 2012) (emphasis added). *See, e.g., Laws v. Harter*, 534 S.W.2d 449, 450–51 (Ky. 1975) (retained sponge), *overruled by Nazar v. Branham*, 291 S.W.3d 599, 605 (Ky. 2009), *as to this constituting per se negligence*; *City of Somerset v. Hart*, 549 S.W.2d 814, 817 (Ky. 1977) (retained scalpel blade).

*Res ipsa loquitur* can apply to an entire surgical team, not just the surgeon. This presumption of negligence would then require individual members of that team to establish that they were either not in constructive control of the retained object or were not responsible for the object's retention.

> Usually, retained foreign object cases originate from medical operations in which multiple medical care professionals perform a variety of tasks . . . . [A]ny number of people including the surgeon, anesthesiologist, nursing staff, and other hospital staff may be at fault for having left an offending item in a plaintiff's body. The varied business relationships which exist at modern hospitals further complicate the issue. Because of these various types of relationships, no two surgical procedures are exactly alike, and the duties and responsibilities of the medical care professionals will likely depend on the specific facts of each case . . . . The *res ipsa loquitur* approach . . . permit[s] juries to infer negligence from the fact of the retained foreign object, while granting them the latitude to analyze other facts and evidence relevant to liability.

*Nazar*, 291 S.W.3d at 604 (paragraph break omitted). To be clear, as noted in *Nazar*, any number of people on the surgical team may be responsible for the tasks they perform and may be at fault for the retained object. That means that

multiple parties may jointly bear responsibility for the retention of the object in the plaintiff.

Consistent with *Nazar,* the majority of our sister courts now reject the view that the surgeon as the "captain of the ship" is the only one who is responsible for mishaps during surgery. "[T]he theory of the surgeon as 'captain of the ship' has given way to the concept of the surgical <u>team</u> in which everyone in the operating room has a duty to maximize the patient's safety." *Surgical fires,* Hospital Negligence § 8:4. *See* Ben A. Rich, *The Assault on Privacy on Healthcare Decisionmaking,* 68 Denv. U.L. Rev. 1, 55 n.23 (1991) (noting "the 'Captain of the Ship' doctrine, which holds that the surgeon in the operating room is ultimately responsible for the acts and omissions of the entire surgical team, including the anesthesiologist, has all but disappeared in recognition of the independent roles and responsibilities of each member of the surgical team"); *Nurse's Failure to Give Physician Timely Notice of Patient's Condition,* 25 Am. Jur. Proof of Facts 2d 411 (Originally published in 1981) (recognizing that there is "a trend away from the 'captain of the ship' doctrine and toward recognizing the independent professional nature of nursing, both inside and outside of the operating room").

The understanding that multiple people may be jointly at fault for retained objects during surgery is well understood. "[T]he presence of multiple defendants in a medical malpractice action does not, of itself, render the doctrine of res ipsa loquitur inapplicable[,]" so long as "*they were in joint control of the agency causing the injury,* it being immaterial that the plaintiff is not able

37

definitely to identify the instrumentality causing the injury." *Physicians and Surgeons: Res Ipsa Loquitur, or Presumption or Inference of Negligence, in Malpractice Cases*, 82 A.L.R.2d 1262 (Originally published in 1962) (emphasis added, footnotes omitted). "The res ipsa loquitur doctrine may apply against two or more defendants if they had joint or shared responsibility or control, or the right of joint control, of the instrumentality which caused the injury, and in a proper case it is for the trier of the facts to say whether either or both had control of the injury-causing instrumentality." *Effect of Joint Control of Injury-Causing Instrumentality by Two or More Persons on Control Requirement*, 57B Am. Jur. 2d Negligence § 1145 (footnotes omitted). *See Injuring-Instrumentality Under Joint Control of Two or More Persons*, Negligence Case: Res Ipsa Loquitur § 2:17 ("res ipsa loquitur doctrine may apply against two defendants if there is joint control, and in a proper case it is for the trier of the facts to say whether either or both had control of the injury-causing instrumentality"); *Res Ipsa Loquitur*, Plaintiff's Proof Prima Facie Case § 13:29 ("res ipsa loquitur can be used to fix responsibility against multiple defendants when they had joint control of the instrumentality causing the injury"). To the extent that *Green v. Owensboro Med. Health Sys., Inc.*, 231 S.W.3d 781, 784 (Ky. App. 2007), appears to hold otherwise, it should be overruled.

"*Res ipsa loquitur* applies in medical malpractice cases when 'any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care' or 'when medical experts may provide a sufficient foundation for *res ipsa loquitur* on

38

more complex matters.'" *Saint Elizabeth Med. Ctr., Inc. v. Arnsperger*, 686 S.W.3d 132, 138 (Ky. 2024) (quoting *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992) (internal citation omitted)). "[I]n determining whether the evidence was sufficient to support an inference of negligence, both common knowledge and the testimony of medical witnesses could be relied on, separately and in combination." *Hausladen*, 828 S.W.2d at 655.

I conclude that this is an ordinary *res ipsa loquitur* situation, which applies to the whole surgical team. As to Dr. Cain and Slone, common knowledge establishes that a piece of surgical equipment, here the needle, should not be left within the surgical site and be retained in a patient following surgery.

## II. KEY EXPERT TESTIMONY REGARDING THE RADIOLOGISTS

Dr. Stanley Dysart is a retired board-certified orthopedic surgeon, with over forty years of orthopedic surgery experience, who is a graduate of the University of Georgia, with his orthopedic residency at Walter Reed and a fellowship in adult reconstructive surgery through Harvard Medical School. He was retained by Lloyd to evaluate this surgery. His deposition testimony was that when he viewed the only x-ray taken during surgery, the surgical needle is "obvious on the x-ray[,]" is "plain as day" and Dr. Griffin's and Dr. Cain's failure to spot it was "a stunning miss" and "totally shocked" him.[8] Dr. Dysart

---

[8] Dr. Dysart explained that he viewed this x-ray on the actual film, through a png image (rather than a paper printout), which was not as good as the x-ray being viewed on the PACS-type system as would have been done at the hospital.

also opined the wrong x-ray was taken and "a second view would have shown even better that there was a metallic foreign body[,]" so the failure to "get a second film" was "hugely an error, an error of judgment, an error of understanding" because getting "a second view" is "just standard." Dr. Dysart summarized:

> So you have an image in front of you, which is not an AP knee x-ray. It's a rotated image. So it's not a standard AP film, first of all. It's one image. That's all—that's all we're look at here.
>
> On that image, you can see the needle. What I'm suggesting, emphatically stating, is that you need more than one image to evaluate for a foreign body that's lost.
>
> You have got to have two images, or, better yet, bring a C-Arm in and rotate around the whole knee.
>
> This is, like, insane. So that's what I'm saying.
>
>  . . . .
>
> I mean, you have to understand the gravity of this. This is a—so if you lose a needle in a patient, this is a big deal.
>
> You have got to solve the issue. And you can't make assumptions that it's laying on the floor or out in the sink or whatever, popped off, you know, out the window.
>
> You've got to look for it. And you've got to understand what is appropriate. This image is completely inappropriate to try to find a needle, even though I can still see it. It's obvious.

Dr. Dysart further opined as to the problems regarding the x-ray:

> In this case, we have a solid implant, a metal implant which blocks all the views going through it. . . .
>
> You're looking for a little needle. You've got to get another view to correctly evaluate the entire surgical field. That's as plain as it can be right there.

That's what I've been trying to tell everybody. That's what's appropriate. That has to be done. Because the entire surgical field was not evaluated, and that's inappropriate.

While Dr. Dysart stated that he did not know the radiology standard of care, and was not qualified to testify regarding the American College of Radiology standards, he was also emphatic in stating that Dr. Cain failing to gain appropriate images was below the standard of care in this specific situation:

Because even a radiologist—a radiologist should know that you can—that the entire surgical field is not imaged on that rotational AP film. It's just not. He should know that.

Whether—whether I'm an expert in radiology or not, anybody knows that[.]
. . . .
The radiologist should know . . . . that.

Dr. Dysart also opined that the actions by the surgeon, his medical staff, the radiologists, Dr. Cain and Dr. Henley, and the hospital "fell below the standard of care causing and contributing to the present and continued harm to the patient."

### III. KEY PROCEDURAL BACKGROUND

Regarding Slone, the trial court opined that she was the only defendant who had control of the instrumentality (the suture needle), agreed that the doctrine *res ipsa loquitur* could be invoked to create a rebuttable presumption of negligence on her part, but further ruled that this presumption was rebutted by the facts in the record because Lloyd stipulated that "[n]o witness has testified as to a specific act or lack thereof on the part of Ms. Slone that was

41

contrary to the protocol in question" and the experts did not criticize her conduct as breaching the standard of care.

This ruling relied on the trial court's previous decision to grant the hospital's motion to exclude more than sixty pages of Dr. Dysart's deposition testimony, as there was not appropriate notice that he would make opinions as to the hospital's liability. Among this excised portion of Dr. Dysart's testimony was his opinion that the hospital's policy on retained objects had not been followed, Slone could have removed stitches to look for the needle, and Dr. Cain violated a general standard of care requiring at least two x-rays to look for a retained metal object, especially given that the metal implant could block a view of the needle.

Based on its ruling that Slone was the *only* defendant who had control of the instrumentality when it was lost, the trial court concluded that the doctrine of *res ipsa loquitur* was inapplicable to the hospital and the radiologists, and the lack of expert testimony as to the nursing standard of care and radiology standard of care meant that the hospital and radiologists should also be granted summary judgment.

The Court of Appeals correctly determined that, regarding the radiologists, Dr. Dysart's expert testimony was sufficient to take the matter before the jury as it was admissible, and the fact that he was an expert on this type of surgery rather than an expert in radiology went to the weight to be given to his testimony. The Court of Appeals reached this conclusion even though it also ruled that the trial court did not abuse its discretion in striking a

42

large portion of Dr. Dysart's deposition testimony so that it could not be used against any defendant, concluding that there was sufficient remaining evidence from Dr. Dysart that the radiology defendants made a grave error. In reversing the grant of summary judgment dismissing the radiology defendants, the Court of Appeals did not examine this issue through the lens of *res ipsa loquitur*.

The Court of Appeals concluded that *res ipsa loquitur* was sufficient to bring the matter of Slone's liability before the jury because: the retention of a surgical needle was not an ordinary risk of surgery; the needle was in Slone's exclusive control (as the trial court found); Lloyd did nothing to contribute to this injury; there was evidence of record that the retained needle was the cause of Lloyd requiring subsequent revision surgery; and even if a surgical needle could become detached without negligence on the part of Slone, "that alone does not rebut the reasonable inference that a needle should not *remain* in the body of a patient." The Court recognized that "[t]he fact that the needle was left and that it caused injury to Lloyd is certainly something that the jury could infer through common knowledge as something that should not have happened" in the absence of "proper skill and care."

The Court of Appeals concluded that summary judgment was properly granted to the hospital because there was an absence of evidence that its employee (the circulating nurse who charted what occurred during surgery, the incorrect instrument count, the efforts to find the needle, and that Dr. Griffin ordered, read, and cleared an x-ray) was in control of the suture needle that remained in Lloyd's knee. The Court rejected the notion that the hospital could

43

be liable when its policies relating to missing instrumentation were not followed. The Court concluded Dr. Dysart's testimony regarding the hospital's negligence was properly excluded, and a policy itself could not establish standard of care.

The radiologists and Slone appealed. Lloyd did not cross-appeal the Court of Appeals' affirmance as to the hospital. The grant of summary judgment to the hospital was resolved, is final, and is concluded.

The majority opinion now determines that summary judgment was properly granted to the radiology defendants as the expert testimony of Dr. Dysart was insufficient to establish a violation of the standard of care. In making such a ruling, it implicitly confirms that striking a large portion of his deposition testimony, which includes his opinion as to a general standard of care regarding appropriate x-rays, was appropriate.

The majority opinion concludes that summary judgment was properly granted to Slone because she had overcome the presumption of negligence in the *res ipsa loquitur* standard as there was no evidence that she was negligent in losing control of the needle and there was no evidence that after it was lost that she had actual or constructive control over the needle. The majority opinion bases this second finding on the statutory definitions associated with surgical assistants in Kentucky and makes additional findings that "Slone did everything within her power to find the needle after it had been lost—she notified Dr. Griffin and the rest of the surgical team and conducted a visual search for the needle" and "after she lost physical custody of the needle, the

44

needle became under the constructive control of Dr. Griffin." This reliance on Dr. Griffin's role as precluding liability by others is an improper rejection of the reality that each member of the surgical team has a legal duty to keep the patient safe.

## IV. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is only appropriately granted where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rules of Civil Procedure (CR) 56.03.

"The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). "A single issue of material fact, the resolution of which could reasonably change the outcome of the litigation is sufficient to overcome a motion for summary judgment." *Clair v. Hillenmeyer*, 232 S.W.3d 544, 550 (Ky. App. 2007). "Undisputed facts will not support a summary judgment if contrary inferences may be drawn therefrom." *Roberts v. Davis*, 422 S.W.2d 890, 894 (Ky. 1967).

"Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either

the trial court's assessment of the record or its legal conclusions." *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010). We will uphold a trial court's grant of summary judgment only where it correctly found there were no disputed issues as to any material facts, the moving party was entitled to judgment as a matter of law, and the adverse party cannot prevail under any circumstance. *Dolt, Thompson, Shepherd & Conway, P.S.C. v. Commonwealth ex rel. Landrum*, 607 S.W.3d 683, 686 (Ky. 2020).

**B. Application of the *Res Ipsa Loquitur* Doctrine.**

Normally in a medical malpractice action, expert testimony is required to establish whether the conduct at issue violated the standard of care and caused the damages claimed by the plaintiff. *Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 578 (Ky. 2019); *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010). The doctrine of *res ipsa loquitur* is an exception to this general rule in circumstances in which lay persons can recognize or infer negligence based on their common knowledge or experience. *Ashland Hosp. Corp.*, 581 S.W.3d at 578. *See Phillips v. Tangilag*, 14 F.4th 524, 540 (6th Cir. 2021) (applying Kentucky law) (explaining "[u]nder the '*res ipsa loquitur*' exception, a patient does not need expert testimony about the standard of care if an ordinary person could conclude that a certain result would not happen if the doctor had performed with the proper skill").

Summary judgment cannot be properly granted to the movant if *res ipsa loquitur* applies. Expert testimony is not required to survive summary judgment and summary judgment is not appropriate. *See Hausladen*, 828 S.W.2d at 654.

46

It is well established that surgery is a team effort in which multiple members of the surgical team may be responsible for the retention of an object within the patient. *Nazar*, 291 S.W.3d at 604. In *Morris v. Boerste*, 641 S.W.3d 688, 695-97 (Ky. App. 2022), the surgeon and hospital that employed nurses were both subject to punitive damages when sponges were retained in the patient.

The whole team may be negligent in certain circumstances. In *Se. Ky. Baptist Hosp., Inc. v. Bruce*, 539 S.W.2d 286, 287–88 (Ky. 1976), the surgeon, anesthesiologist, and surgical technician all had a duty to check the patient's identity on her patient identification bracelet before operating but none of them did; therefore, they were all liable when the wrong patient was operated upon.

Accordingly, *res ipsa loquitur* may be properly established when a whole surgical team may be jointly in control of the foreign object which is retained in a patient and caused the patient's injury so long as this retention could not have occurred "if those having control and management had not been negligent." *Eaton v. Swinford*, 424 S.W.2d 118, 119 (Ky. 1967).

**C. Dr. Cain and his Employer Should Not Have Been Granted Summary Judgment.**

### 1. *Res Ipsa Loquitur* Applies to the Radiologists, and Material Issues of Fact Should Be Resolved by the Jury.

Viewing the evidence in the light most favorable to Lloyd, as required under the summary judgment standard, I conclude that Lloyd established the existence of genuine, material issues of fact. The trial court erred by resolving these factual issues against Lloyd and the majority opinion also erred in

47

making its own factual findings against Lloyd. Therefore, summary judgment was inappropriately granted to Dr. Cain, his employer, and Slone.

As to Dr. Cain, the standard for *res ipsa loquitur* was satisfied by establishing that the needle was within the exclusive joint control of the surgical team which could include Dr. Cain, when entrusted to locate the needle within Lloyd or conclusively determine that it was not within her body. Dr. Cain failed in his duty to properly rule out the needle's retention.

There are multiple jury questions on issues of fact regarding Dr. Cain's conduct and depending upon how they are resolved, he may overcome the presumption of negligence. The jury needs to decide whether he became part of the surgical team when he was called upon to read the x-ray to determine whether the needle was retained in the surgical site and whether he was constructively in possession of the needle under these circumstances. As to his negligence in reading the x-ray, a radiologist should be able to identify a metal object on x-rays. The needle was spotted later on x-rays taken a month after surgery, showing that the needle always could have been located on x-rays had proper x-rays been taken and properly interpreted during surgery. The majority has erred in concluding that negligence cannot be established against Dr. Cain.

### 2. Alternatively, *Res Ipsa Loquitur* with the Assistance of Expert Testimony Applies to the Radiologists.

Lloyd's negligence claim against the radiologists should also survive summary judgment because there was relevant expert testimony that clarified the matter further. Regarding more complex matters, *res ipsa loquitur* applies when, "expert testimony [can] establish[] [that] the 'type of injury was not an

ordinary risk of the surgery, that the method by which it occurred was within the exclusive control of the defendant, and that the injury was not due to any voluntary action or contribution on the part of the plaintiff.'" *Arnsperger*, 686 S.W.3d at 138 (quoting *Hausladen*, 828 S.W.2d at 655). Therefore, in *Hausladen*, we stated that in a variety of medical malpractice cases, the *res ipsa loquitur* inference of negligence was "sufficiently supplied by medical testimony of record *even though the plaintiff had no expert witness to opine that the conduct fell below the <u>standard of acceptable professional care</u>*." 828 S.W.2d at 655 (emphasis added).

Here, Dr. Dysart's expert medical testimony establishes a foundation that gives rise to an inference of negligence by Dr. Cain, even if Dr. Dysart cannot establish the relevant radiological standard of care. Dr. Dysart provided this foundation by explaining what could be viewed on the x-ray that was taken, and what type of x-rays are needed in this situation.

Dr. Dysart established that Dr. Cain's failure to locate the needle in Lloyd's body before the surgery was complete (resulting in its retention) was not an ordinary risk of surgery where the needle could have been located through x-ray images before the surgery was complete. Dr. Dysart also established that the needle was not located by Dr. Cain due to an inaccurate reading of the x-ray that was taken. Dr. Dysart clarified that a minimum of two x-rays were required to find a metal needle against a metal joint which could mask the needle and anyone reading x-rays for such a purpose should know this. It would be a question for a jury to determine whether Dr. Cain should have

observed the needle on the x-ray, and what he was obligated and authorized to do in the situation where the surgeon had not ordered appropriate x-rays of at least two views of the knee.

### 3. Striking Portions of Dr. Dysart's Testimony Against the Radiologists Was Improper.

CR 26.02(4) requires parties to disclose, upon request before trial, "facts known and opinions held by experts," including, "the subject matter on which the expert is expected to testify, and . . . the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." The purpose behind CR 26.02(4) "is to allow the opposing party to adequately prepare for the substance of the expert's trial testimony." *Pauly v. Chang*, 498 S.W.3d 394, 411–12 (Ky. App. 2015).

If a party fails to make an appropriate disclosure, trial courts are permitted to exclude such inadequately disclosed expert testimony. However, "the person requesting exclusion of testimony must show prejudice. Otherwise, there is no valid basis to exclude or limit testimony." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006).

We review a trial court's decision to limit or exclude expert testimony for abuse of discretion. *Oliphant v. Ries*, 568 S.W.3d 336, 342 (Ky. 2019). Such discretion is abused when the "decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676, 684 (Ky. 2005).

While I agree that it was within the discretion of the trial court to strike portions of the testimony of Dr. Dysart which related to possible liability to the hospital due to Lloyd's failure to disclose that this expert would testify about the hospital's liability, I conclude that the trial court abused its discretion to the extent that it struck portions of his testimony which did not specifically relate to liability by the hospital, and only related to other defendants. Such a decision was patently arbitrary, unreasonable, unfair, and unsupported where the trial court excluded testimony relating to the radiology defendants' conduct. The radiology defendants received an appropriate disclosure as to opinions Dr. Dysart would make regarding their conduct and could adequately prepare for such opinions. The radiology defendants did not ask for anything to be stricken from Dr. Dysart's deposition testimony and, additionally, had no basis for requesting that anything be stricken from the portion of this testimony.

Lloyd properly opposed this broad exclusion, explaining why the exclusion of testimony was excessive and inappropriate as it related to the radiologists and also properly asked for rehearing on this issue. The evidence relating solely to the radiologists' conduct could not prejudice the hospital and, therefore, there was no reason to exclude it.

The opinions Dr. Dysart made regarding the radiologists in this portion of his deposition testimony are properly admissible against Dr. Cain and his employer. It would be appropriate to reverse and require the trial court to determine, now that the hospital has been dismissed as a party, whether *any*

51

portion of Dr. Dysart's testimony should still be stricken or excluded. However, Dr. Dysart's testimony provided ample grounds upon which a presumption of negligence by Dr. Cain can be established under the doctrine of *res ipsa loquitur* with or without such testimony.

I further conclude that Dr. Dysart's wrongfully excluded testimony established that there is a basic, underlying standard of care in any kind of imaging to locate a lost metal object, that at least two views are necessary. Dr. Dysart's opinion regarding standard of care was nuanced. He explained he could not testify as to what the Academy of Radiology required as far as standard of care, but he could identify a minimum standard of care for looking for a retained object; his opinion was that at least two views were needed. This, also, should have been enough to conclude that summary judgment should not have been granted in favor of Dr. Cain.

**D. Slone Should Not Have Been Granted Summary Judgment.**

Slone lost the needle. If Slone had not lost the needle, there would be no injury. *Res ipsa loquitur* provides an inference of negligence against Slone. While Slone's responsibility as to the retained needle was different from those of the surgeon and radiologist, she was still a member of the surgical team responsible for keeping foreign objects from being retained in Lloyd's body. The record established that she had control over the needle when it became lost, and the presumption is that she was negligent in its loss. Once *res ipsa loquitur* applies, the questions of whether she was negligent and whether her action contributed to Lloyd's damages become jury questions.

52

In addition to informing the surgeon of the lost needle, Slone's conduct in looking for the needle in Lloyd's surgical wound and in the surgical room was clearly insufficient as she did not discover the needle. How thoroughly she searched the room and how confidently she informed Dr. Griffin of her belief that the needle was not in the surgical wound, is conduct for which she is responsible. Therefore, it is appropriate for the presumption of *res ipsa loquitur* to also apply to her other conduct as she could bear some comparative fault for Lloyd's injuries.

## V. CONCLUSION

As noted in *Nazar*, 291 S.W.3d at 604, pursuant to the doctrine of *res ipsa loquitur*, "juries should generally be permitted to determine a healthcare professional's liability in a retained foreign object case." This is such a case, and the jury should be permitted to evaluate whether Dr. Cain became a member of the surgical team and, if so, whether he and his employer are liable under comparative negligence for Lloyd's injuries where Dr. Cain failed to find the surgical needle. The jury should also be permitted to evaluate whether Slone was also responsible for the damage caused by the retained needle.

Accordingly, I would affirm the Court of Appeals' opinion that summary judgment should have been denied to Dr. Cain, Diagnostic X-Ray Physicians, and Slone.

COUNSEL FOR APPELLANTS/APPELLEES, DIAGNOSTIC X-RAY PHYSICIANS, PSC (DXP); DARREN CAIN, M.D.; AND CHRISTOPHER DALE HENLEY, M.D.:

Robert Lee Whitmer
Dentons Bingham Greenebaum LLP

Craig Louis Johnson
Steptoe & Johnson PLLC

Timothy Bland George, Jr.
Reminger Co. LPA

COUNSEL FOR APPELLANT/APPELLEE, SHEILA SLONE KCSA:

Michael D. Risley
Charles H. Stopher
Edward H. Stopher
Bethany A. Breetz
Stites Harbison PLLC

Kristin Nichole Logan Mischel
Kentucky State Police

COUNSEL FOR APPELLEE, DEBORAH LLOYD:

Kenneth H. Baker

Richard Paul Schiller
Richard P. Schiller Attorney

COUNSEL FOR APPELLEE, NORTON'S HOSPITALS, INC. D/B/A NORTON'S WOMEN'S AND CHILDREN'S HOSPITAL:

Karen Lee Keith
Virginia Leigh Schell
Stoll Keenon Ogden PLLC


COUNSEL FOR AMICUS, AMERICAN MEDICAL ASSOCIATION AND KENTUCKY MEDICAL ASSOCIATION:

Philip S. Goldberg
Shook, Hardy & Bacon LLP

Carolyn Purcell Michener
Michener Mullins & Arrington PLLC